Argued and submitted March 8, 2000, accused disbarred March 14, 2002

In re Complaint as to the Conduct of

# NIKOLAUS ALBRECHT,
*Accused.*

## (OSB 95-195; SC S45913)

42 P3d 887

Marc D. Blackman, Ransom Blackman, Portland, argued the cause and filed the brief for the accused.

Mary A. Cooper, Assistant Disciplinary Counsel, Oregon State Bar, Lake Oswego, argued the cause and filed the briefs for the Oregon State Bar.

Before Carson, Chief Justice, and Gillette, Durham, Leeson, and Riggs, Justices.*

PER CURIAM

Durham, J., dissents and files an opinion.

* Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of this case; Kulongoski, J., resigned June 14, 2001, and did not participate in the consideration or decision of this case; De Muniz and Balmer, JJ., did not participate in the consideration or decision of this case.

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged Nikolaus Albrecht (the accused) with four counts of violating Disciplinary Rule (DR) 1-102(A)(2) (prohibiting criminal act that reflects adversely on honesty, trustworthiness, or fitness to practice law) of the Code of Professional Responsibility, four counts of violating DR 1-102(A)(3) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), four counts of violating DR 7-102(A)(7) (prohibiting assisting client in conduct that lawyer knows is illegal), four counts of violating DR 7-102(A)(8) (prohibiting knowing engagement in illegal conduct), three counts of violating DR 9-101(A) (requiring deposit of all funds of client in trust account), two counts of violating *former* DR 9-101(B)(4) (requiring maintenance of complete records of all client funds),[1] two counts of violating ORS 9.460(1) (requiring lawyers to support federal and state law), four counts of violating ORS 9.527(1) (prohibiting lawyers from committing act that, if that lawyer were applying for Bar admission, would cause application to be denied), and four counts of violating ORS 9.527(4) (prohibiting lawyers from engaging in willful deceit or misconduct in legal profession).

After a hearing before a three-member trial panel, Bar Rule of Procedure (BR) 2.4(i)(1), the trial panel ruled that the Bar had obtained most of its evidence in violation of Federal Rule of Criminal Procedure 6(e) (Rule 6(e)), the federal grand jury secrecy rule (set out below). The trial panel decided that the only appropriate remedy for that Rule 6(e) violation was a dismissal of the Bar's complaint. Recognizing, however, that this court might disagree with its decision to dismiss the complaint, the trial panel also made findings on the merits. A two-member majority concluded that the accused had committed single violations of DR 1-102(A)(2), DR 1-102(A)(3), DR 7-102(A)(7), and DR 7-102(A)(8). The majority held that the accused's misconduct would warrant disbarment. One trial panel member dissented, opining that

---

[1] In 1995, *former* DR 9-101(B)(4) was renumbered as DR 9-101(C)(3). There was no change to the text of the rule.

the Bar had failed to prove any allegation by clear and convincing evidence.

The Bar sought review. ORS 9.529.[2] In this court, the Bar argues that we should reject the trial panel's decision to dismiss its complaint as a remedy for violating Rule 6(e). On the merits, the Bar seeks review of only two of its four causes of complaint. Specifically, the Bar urges this court to find that the accused violated DR 1-102(A)(2), DR 1-102(A)(3) (two counts), DR 7-102(A)(7), DR 7-102(A)(8), DR 9-101(A), ORS 9.460(1), and ORS 9.527(4) (two counts), and to disbar the accused. The accused contends that the Bar violated Rule 6(e) and that the only appropriate remedy to redress that violation is to dismiss the complaint. Alternatively, the accused argues that he did not violate the disciplinary rules in question and that, even if he did, the appropriate remedy is, at most, a 30-day suspension.

---

[2] The Bar asserts that it seeks review under ORS *9.536(1)*. The accused does not dispute that assertion. Nevertheless, we address the issue of the statutory basis for our review, because the issue is jurisdictional. ORS 9.536(1) provides, in part:

"\* \* \* If the decision of the disciplinary board *finds the accused attorney has not committed the alleged wrongdoing or determines that the accused attorney should be disciplined* by way of reprimand or suspension from the practice of law up to a period of six months, the Oregon State Bar or the accused, as the case may be, may seek review by the Supreme Court. Such review shall be a matter of right upon the request of either party. *Otherwise, the decision of the disciplinary board shall be final.* \* \* \*"

(Emphasis added.) In this case, however, the trial panel did not find that the accused had not committed the alleged wrongdoing or that the accused should be disciplined. Instead, it dismissed the complaint on the ground that the Bar had violated Rule 6(e).

ORS 9.529 provides this court with jurisdiction over the present proceeding:

"Bar proceedings relating to discipline, admission and reinstatement are neither civil nor criminal in nature. They are sui generis and within the inherent power of the Supreme Court to control. *The grounds for \* \* \* the discipline of attorneys set forth in ORS 9.005 to 9.755 are not intended to limit or alter the inherent power of the Supreme Court \* \* \* to discipline a member of the bar.*"

(Emphasis added.) *See also Balderree v. OSB*, 301 Or 155, 159-60, 719 P2d 1300 (1986) (asserting jurisdiction over case in which federal district court temporarily had stayed lawyer's suspension for failure to pay Professional Liability Fund assessment on ground that case involved suspension of lawyer, which "is a matter for final decision of this court"). Because this proceeding involves discipline of a member of the Bar, this court has the inherent power to review the decision of the trial panel.

This court reviews the trial panel's decision *de novo*. ORS 9.536(3). The Bar has the burden of proving misconduct by clear and convincing evidence. ORS 9.536(2); BR 5.2. For the reasons that follow, we conclude that the complaint should not have been dismissed, that the accused has committed serious violations of the disciplinary rules, and that the accused should be disbarred.

## FACTS

We find the following facts by clear and convincing evidence. In 1978, the accused represented Farber in a real estate matter. At that time, Farber was engaged in the business of buying, selling, and managing real estate. Over the next two years, the accused represented Farber on several other real estate matters, and they became social friends.

In 1980, a man named Foss was murdered. Farber was charged with the murder. At his trial, which the accused attended,[3] the state proceeded on the theory that Farber was a drug dealer, that Foss was his supplier, and that Farber had contracted for Foss's murder to avoid paying a drug debt. During his testimony at trial, Farber admitted that he was a drug dealer and testified at length about his illegal drug distribution activities, but denied involvement in the murder. A jury nonetheless convicted Farber of murder, and he was sentenced to life in prison. *See State v. Farber*, 295 Or 199, 666 P2d 821 (1983) (affirming conviction; remanding for resentencing).

Farber was released from prison in March 1987, and he then obtained work in the sales field. He also began selling cocaine, which he acquired from Sturgis, whom he had met in prison. Sturgis, in turn, acquired the cocaine from Charlesworth, whom Farber also had met in prison.

Several months after his release, Farber approached the accused for legal services in connection with real estate purchases for investors that Farber had recruited. The accused agreed to assist Farber in those transactions. The accused and Farber did not have a fee agreement.

---

[3] The accused did not represent Farber at his criminal trial.

Pursuant to their arrangement, the accused helped Farber consummate four real estate purchases between 1987 and 1989. In the first transaction, Farber found property that was of interest to his investors and signed an earnest money agreement under the name SKAMCO, Inc. (on later documents, the purchaser was identified as "Vernon Baker"). At some point, Farber delivered an amount of money not disclosed in the record to the accused and instructed the accused to deposit that money into his trust account. According to the accused, Farber told him (and he believed) that the money came from legitimate investors. Later, the accused drafted a land sale contract for "Buyer" and wrote a $14,000 check on his trust account as a down payment for the property. The accused never met the buyer.

The second transaction occurred several months later. The accused again assisted Farber in a real estate purchase, this time in the name of an investor named McGuire. The accused received funds from Farber before the purchase and deposited the money into his trust account. The funds that the accused deposited were made up of at least $8,700 in cash and $6,600 in personal checks, payable to and endorsed by the accused. The accused then drafted a land sale contract in McGuire's name and drew a check on his trust account in the amount of $29,000 for the down payment. According to the accused, he was introduced to McGuire on a single occasion at around that time.

The accused performed similar services for Farber in connection with two other real estate purchases in late 1988 and early 1989. Before the third purchase, the accused deposited 13 cashier's checks, payable to the accused, totaling over $45,000 into his trust account. Each of the cashier's checks were in amounts of less than $10,000.[4] The accused took $500

---

[4] The Bar argues that that denomination is significant in light of several federal money-laundering statutes, which provide the bases for several of the Bar's allegations. First, federal law requires financial institutions to report cash transactions of more than $10,000 to the federal government. 31 USC § 5313; 31 CFR § 103.22(b)(1). Second, 18 USC § 1956(a)(1) provides, in part:

"Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

"* * * * *

cash back from that deposit. He also wrote himself a check for $1,000 a few days after the deposit. Although the accused does not recall why he made those withdrawals, he maintains that he would not have withdrawn any funds for himself unless Farber had authorized him to do so. Before the fourth purchase, the accused deposited nine cashier's checks totaling about $41,000 in his trust account. Those checks were payable to and endorsed by the accused. All of the checks were in amounts less than $10,000. Both purchases were made in the name "Barbara Woodson," an investor whom the accused never met and from whom he never received money.

On May 1, 1989, the accused opened a new trust account, designating it the "Farber Ltd." trust account. The accused later explained that the growing frequency of Farber's transactions motivated him to keep Farber's funds separate from his other clients' funds. The opening deposit in the Farber Ltd. trust account, totaling $53,738.82, consisted of cash and 12 cashier's checks from Farber. All the cashier's checks were payable to and endorsed by the accused. Three of those cashier's checks had been purchased by "Jim Anderson," four by "Jim Pierson," two by "Jim Robinson," one by "J. Robinson," and one by "Jim Allen." The purchaser of the twelfth check was unidentified. All the cashier's checks were in amounts less than $10,000. Farber then asked the accused to draw a check in Farber's name for another real estate purchase. On May 9, 1989, the accused wrote a check to Farber on the Farber Ltd. trust account in the amount of $58,200, leaving a balance of $85.20. Farber took the check and left the state. The accused did not hear from Farber for

---

"(B)  knowing that the transaction is designed in whole or in part -

"(i)  to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

"(ii)  to avoid a transaction reporting requirement under state of Federal law,

"shall be sentenced to a fine * * * or imprisonment for not more than twenty years, or both."

Additionally, 18 USC § 1957 makes it a crime to:

"knowingly engag[e] * * * in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity[.]"

more than one year and never had significant contact with Farber again.

Several weeks after Farber left the state, Farber's client McGuire (who was, in fact, Charlesworth) contacted the accused. McGuire asked the accused to render the same legal services for him that the accused had rendered for Farber. The accused agreed to assist McGuire. As was true respecting his relationship with Farber, the accused and McGuire had no written fee agreement.

Just as he had done for Farber, the accused deposited cash and cashier's checks that McGuire gave him into the Farber Ltd. trust account and drew checks on that account to cover McGuire's down payments on real estate transactions. All of the cashier's checks were in amounts less than $10,000 and all were payable to and endorsed by the accused. The accused performed those services for McGuire in connection with a total of four real estate transactions. On six occasions, the accused took cash back from the deposits, usually a few hundred dollars. On 18 occasions, the accused wrote checks to himself or to "cash" from the account; the amounts varied from $150 to $1,600. The accused maintains that he would not have taken funds from the account unless McGuire had instructed him to do so.

There was a major difference, however, between the accused's handling of funds that he received from McGuire and his handling of funds that he had received from Farber. With Farber, the accused immediately had deposited *all* the funds received, no matter the total amount of the deposit. With McGuire, the accused ensured that the total of virtually every deposit made into the Farber Ltd. trust account was less than $10,000.[5]

For example, the record contains a handwritten receipt, signed by the accused, showing that, on July 18, 1989, the accused received $76,000 from McGuire. The

---

[5] A $37,500 bank-issued cashier's check, labeled "redeposit," was deposited into the trust account on October 20, 1989. It is unclear whether and to what degree 18 USC § 1957 applies to that redeposit. Regardless, a single deposit in excess of $10,000 does not lessen the significance of the accused's pattern of making deposits less than $10,000.

accused's trust account records, however, do not show a $76,000 deposit on July 18 or any day thereafter. Rather, the trust account records show that, over the course of two months, the accused made nine different deposits, each in an amount less than $10,000. The nine deposits included 17 cashier's checks, each dated July 17, 1989. Almost all the cashier's checks denoted McGuire as the purchaser. One deposit during that two-month period consisted of $8,750 in cash. By the end of September 1989, the accused had deposited $59,625.53 of the $76,000 into the Farber Ltd. trust account. The record does not indicate what happened to the remaining $16,374.87.[6]

In May 1991, state law enforcement authorities arrested Sturgis, Farber's former drug supplier, in a drug "sting" operation. The record is not entirely clear on the exact

---

[6] The following chart shows the deposit history of the $76,000 sum that the accused received from McGuire on July 18, 1989.

| Date | Deposit | Deposit Items |
| --- | --- | --- |
| July 18, 1989 | $6,000 | $3,000 cashier's check purchased by "McGuire" on July 17, 1989. <br> $3,000 cashier's check purchased by "McGuire" on July 17, 1989. |
| July 19, 1989 | $2,800 | $3,000 cashier's check purchased by "McGuire" on July 17, 1989 (less $200 cash the accused took back from the deposit). |
| July 19, 1989 | $7,000 | $4,000 cashier's check purchased by Brian Charlesworth on July 14, 1989. <br> $3,000 cashier's check purchased by "McGuire" on July 17, 1989. |
| July 24, 1989 | $9,000 | $3,000 cashier's check purchased by "McGuire" on July 17, 1989. <br> $3,000 cashier's check purchased by "McGuire" on July 17, 1989. <br> $3,000 cashier's check purchased by "McGuire" on July 17, 1989. |
| July 28, 1989 | $9,000 | $3,000 cashier's check purchased by "McGuire" on July 17, 1989. <br> $3,000 cashier's check purchased by "McGuire" on July 17, 1989. <br> $3,000 cashier's check purchased by "McGuire" on July 17, 1989. |

chain of events that followed; however, investigation of Sturgis led both to his drug supplier, Charlesworth, and to Farber. Further investigation revealed that one of Charlesworth's aliases was McGuire. More investigation led to the accused. At some point, federal authorities became involved. Eventually, the matter was presented to a federal grand jury.

On a date not revealed in the record, an Assistant United States Attorney served on the accused's bank a grand jury subpoena for the accused's trust-account records. The bank complied with the subpoena.[7]

In May 1993, the Assistant United States Attorney who was prosecuting the case moved the federal district court for an order under Rule 6(e) permitting him to disclose grand jury material to a Multnomah County Deputy District Attorney, an Assistant Attorney General, and their clerical staff.[8]

| | | |
|---|---|---|
| August 14, 1989 | $5,925.53 | $3,000 cashier's check purchased by "McGuire" on July 17, 1989. $3,125.53 cashier's check, no purchaser indicated, dated August 1, 1989 (less $200 cash taken back from this deposit by the accused). |
| August 30, 1989 | $5,650 | $3,000 cashier's check purchased by "McGuire" on July 17, 1989. $3,000 cashier's check purchased by "McGuire" on July 17, 1989 (less $350 cash taken back from this deposit by the accused). |
| September 8, 1989 | $8,750 | Cash |
| September 11, 1989 | $5,500 | $3,000 cashier's check, no purchaser indicated, dated July 17, 1989. $3,000 cashier's check purchased by "McGuire" on July 17, 1989 (the accused took $500 cash back from this deposit). |

[7] Farber had obtained immunity from prosecution under an agreement with the federal government. Farber later obtained immunity from state prosecution under an agreement with the state government. Farber testified before the trial panel in this proceeding under the belief that his immunity agreement with the state required him to do so.

[8] Rule 6(e) provides, in part:

"(2) General Rule of Secrecy. A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded

The district court granted the motion.[9] The accused's trust-account records were among the documents of which the district court permitted disclosure.

In the spring of 1995, the Deputy District Attorney (DDA) who had received the grand jury materials under the

---

testimony, an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision [relating to government personnel assisting a government attorney] *shall not disclose matters occurring before the grand jury*, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court.

"(3) Exceptions.

"* * * * *

"(C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made-

"* * * * *

"(iv) when permitted by a court at the request of an attorney for the government, upon a showing that such matters may disclose a violation of state criminal law, to an appropriate official of a state or subdivision of a state for the purpose of enforcing such law.

"*If the court orders disclosure of matters occurring before the grand jury*, the disclosure shall be made in such manner, at such time, and under such conditions as the court may direct."

(Emphasis added.)

[9] The order provided:

"Based upon the motion of the United States of America for disclosure of documents, records and data presented to the federal grand jury in the District of Oregon, this Court finds the government has made a showing that disclosure of grand jury material may disclose a violation of state criminal law; that the United States has shown a particularized need; that failure to order the disclosure will work a possible injustice; the need for disclosure is greater than the need for continued secrecy; the requested disclosure covers only materials needed to bring and proceed with the anticipated state criminal charges; and that state criminal charges will result in an expeditious and fair resolution of this matter.

"It is therefore ordered that the following grand jury materials in the above-captioned grand jury investigation be disclosed to Deputy District Attorney Norman Frink, Assistant Attorney General Kathleen Payne Pruitt, and to their law clerks and clerical staff, and law enforcement agents assisting them:

"All documents, records, data, and testimony, relating to drug offenses, and money laundering offenses involved in those violations;

"All documents, records and data, including testimony, related to property, income and assets involved in money laundering offenses or in violation of drug offenses or any property traceable to such property;

"All documents, records and data, including testimony, related to any and all targets', suspects' and defendants' conduct and property rights as to any assets, liabilities, equity or other item of value."

May 1993 court order, and who subsequently had investigated the case, filed a complaint with the Bar regarding the accused's conduct. In his Bar complaint, the DDA outlined the scheme described above, suggested that the evidence showed that the accused had been engaged in a money-laundering scheme and, in so doing, had violated several disciplinary rules. To support his Bar complaint, the DDA attached a copy of the accused's trust-account records.[10] This proceeding ensued.

On June 17, 1998, the trial panel conducted a hearing on the Bar's complaint. At that hearing, the Bar called Haworth, an IRS special agent, to testify about his investigation of the accused's trust accounts. In aid of an objection, the accused's lawyer asked Haworth if it was his understanding that the records of the accused's trust accounts had been obtained through a federal grand jury subpoena. Haworth responded that that was his understanding. The lawyer then asked Haworth if he had an order under Rule 6(e) authorizing disclosure of the records to the Bar. Haworth indicated that he did not, but that it was his understanding that the United States Attorney's office had one, because "otherwise I wouldn't be here testifying." The accused's lawyer then stated that, until such an order was produced, he would object to the introduction of the trust-account records and to evidence derived from those records on the ground that they were subject to the grand jury secrecy rule, Rule 6(e), and could not be disclosed without a federal court order.[11]

The Bar's lawyer replied:

"I've never heard of this objection, I'm totally unprepared to respond to it. I can say that the bar got these records from the district attorney's office, Norman Frink. The bar didn't get these in response to a grand jury subpoena. So how this—how Mr. Haworth originally obtained his records, I don't know. And what is required there, I don't know. All I can say is, we've got these, we've gone through these with [the accused], they have been exchanged, he's

---

[10] Although the DDA's complaint is not in the record before us, the accused's responses to the complaint are.

[11] The lawyer also noted that, "until this moment[, I] did not realize that was the source of [this] information."

been deposed on it, this is the first I've heard of any objection."

The members of the trial panel indicated that they were unfamiliar with Rule 6(e) and did not know how to proceed. The accused's lawyer briefly explained the rule to them and also noted that he had a "vague memory" that there had been a motion to unseal the grand jury records in 1994 or 1995, and that the motion had been denied. Haworth interjected that the accused's lawyer probably was thinking of a motion to unseal that occurred later in the process, but that there must have been a Rule 6(e) order early on because the case had been "transferred" from the United States Attorney's office to the Multnomah County District Attorney's office and would not have been "transferred" without a Rule 6(e) order. The trial panel then asked the Bar's lawyers:

"Mr. Stroup:  Was there any discussion about the source of the documents?

"Mr. Heiling:  Not that I remember.

"Ms. Hicks:  I can speak to that. The documents were received from the complainant in this case, who happened to be Norm Frink, and they were sent to [the accused] with the initial letter that the [B]ar received. So all of the documents that we received * * * have come from the Multnomah County District Attorney's office.

"Mr. Stroup:  Did they have anything on them identifying where they came from, that they came through this U.S. investigation?

"Ms. Hicks:  Are they stamped with grand jury stamp or something? No.

"* * * * *

"Mr. Stroup:  I was trying to find out if there was any indication on there the source of the documents so that this issue could have been raised earlier in some fashion.

"Ms. Hicks:    No."

The trial panel then asked the Bar's lawyers to make a telephone call to the Multnomah County District Attorney's Office regarding the matter. After a recess, the Bar's lawyer reported:

"Ms. Hicks:    I called Norm Frink at the Multnomah County DA's office, I asked him about whether or not he had a 6-e order. He said that he did not have a copy of it but he is absolutely certain that the records would not have been released to him by the U.S. Attorney's office absent such an order."[12]

The trial panel ultimately concluded that it was more likely than not that the United States Attorney's office and the Multnomah County District Attorney's office had operated in the matter in accordance with the law (*i.e.*, that the federal district court had permitted disclosure), and decided to proceed with the hearing on the basis of that assumption. However, the trial panel placed the Bar under an obligation to try to find the order and suggested that, if no order were found, then the records might have to be excluded.[13] The hearing continued, and the trust account records, Haworth's testimony about the records, and other derivative evidence were received. The hearing concluded on June 24, 1998.

Ten weeks passed, and, after considerable effort, the Bar failed to produce the court order. During that time, the United States Attorney's office retrieved the file that was supposed to the contain the disclosure order, but the order was not in the file. When the trial panel learned that the Bar could not find the order, it issued its decision in the proceeding, in which it inferred from the Bar's inability to produce a copy of the Rule 6(e) order that the federal district court had

---

[12] The accused's lawyer did not object to Bar counsel's report of her telephone call with the DDA.

[13] The trial panel admitted a copy of a Rule 6(e) order as an exhibit of the accused, but that is not the order pertinent to this proceeding. That order, dated July 6, 1995, merely permitted the accused's trust-account records to be disclosed to several Assistant United States Attorneys and to persons assisting them in connection with a judicial forfeiture proceeding.

not permitted disclosure and, thus, that the Bar had received the trust account records in violation of Rule 6(e). The trial panel further concluded that it was required to exclude the trust account records and all evidence thereby derived. Because the excluded evidence was the bulk of the Bar's case against the accused, the trial panel dismissed the complaint for failure of proof.[14] However, the trial panel acknowledged that this court might disagree with its decision to dismiss and made findings on the merits in light of that possibility. In those findings, a majority of the trial panel found that the accused had violated the federal money-laundering statute, 18 USC § 1956, and, therefore, that he had violated DR 1-102(A)(2), DR 1-102(A)(3), DR 7-102(A)(7), and DR 7-102(A)(8), as outlined above. The trial panel also found that the Bar had failed to prove the other causes charged in the complaint. The trial panel concluded that the appropriate sanction for the proven violations would be disbarment.

Shortly after the trial panel had rendered its decision, the United States Attorney's office located the May 1993 Rule 6(e) order that had permitted disclosure of the accused's trust-account records and other grand jury materials to a specified Multnomah County Deputy District Attorney—the order had been misfiled. On September 30, 1998, three weeks after the trial panel issued its decision, the Bar filed a request for reconsideration and attached a copy of the disclosure order. The trial panel denied the Bar's request for reconsideration on the ground that it had no further jurisdiction over the proceeding.

The Bar sought review by this court, specifically challenging both the trial panel's conclusion that the Bar's complaint should be dismissed as a remedy for the presumed violation of Rule 6(e) and the trial panel's findings that the accused had not violated the disciplinary rules alleged in the fourth cause of complaint. The Bar asks this court to affirm the trial panel's alternative findings with respect to the disciplinary violations charged in the first cause of complaint, to

---

[14] We note that it is somewhat unclear whether the trial panel *excluded* the evidence as a *remedy* for the apparent Rule 6(e) violation or whether it *dismissed* the complaint as a *sanction* for the Rule 6(e) violation. That difference, however, does not affect our analysis.

find the accused to have committed of the violations charged in the fourth cause, and to disbar the accused as a sanction.

## RULE 6(e)

Although neither party has cited the pertinent Bar Rule of Procedure, our review of the trial panel's decision to exclude the evidence as a remedy for a Rule 6(e) violation is governed by BR 5.1(b), which provides:

> "No error in procedure [or] in admitting or excluding evidence * * * shall invalidate a finding or decision unless upon a review of the record as a whole, a determination is made that a denial of a fair hearing to either the Bar or the accused has occurred."

Under BR 5.1(b), we review the trial panel's decision to exclude the evidence for error and, if there was error, whether the error denied the Bar a fair hearing.

■      In construing Rule 6(e), we first look to the plain wording of the rule. *See United States v. John Doe, Inc. I*, 481 US 102, 109, 107 S Ct 1656, 95 L Ed 2d 94 (1987) (employing that methodology); *Shaw v. PACC Health Plan, Inc.*, 322 Or 392, 400, 908 P2d 308 (1995) (following methodology used by United States Supreme Court when interpreting federal law).

Rule 6(e)(2) establishes the general rule of federal grand jury secrecy. That rule, set out above, specifically prohibits certain enumerated persons—grand jurors, interpreters, stenographers, operators of a recording device, typists transcribing recorded testimony, attorneys for the government, and those attorneys' assistants—from disclosing "matters occurring before the grand jury, except as otherwise provided for in these rules." Rule 6(e)(2); Rule 6(e)(3)(A)(ii). Rule 6(e) further provides that "[n]o obligation of secrecy may be imposed on any person except in accordance with this rule." Rule 6(e)(2); *see also Worrell Newspapers of Indiana, Inc. v. Westhafer*, 739 F2d 1219, 1223 (7th Cir 1984), *aff'd* 469 US 1200, 105 S Ct 1155, 84 L Ed 2d 309 (1985) ("Rule 6(e) applies * * * only to individuals who are privy to the information contained in a sealed document by virtue of their positions in the criminal justice system.").

■    The Bar is not one of the enumerated persons on whom the rule imposes an obligation of secrecy: Under the plain wording of the rule, the Bar has no obligation of secrecy. Thus, the Bar is not prohibited from either possessing or using the accused's trust-account records in this proceeding. *See In re Charlotte Observer*, 921 F2d 47 (4th Cir 1990) (vacating injunction that prohibited newspapers from publishing name of target of ongoing grand jury investigation when judge accidentally mentioned name in open court); *In re Polypropylene Carpet Antitrust Litigation*, 181 FRD 680, 693-94 (ND Ga 1998) (concluding that private party that lawfully, albeit accidentally, obtained grand jury material and related internal documents from United States Attorney's Office had no obligation under Rule 6(e)(2) to return them). The Bar would have had to have obtained a federal court order if the Bar had sought to obtain the trust account records directly from the federal court. *See In re Barker*, 741 F2d 250 (9th Cir 1984) (affirming order granting disclosure of grand jury material to Bar). Because the Bar did not receive the trust-account records directly from federal court, however, the Bar did not need a disclosure order.

If Rule 6(e) prevented the Bar from either possessing or using the trust account records, then we would agree with the trial panel that excluding the records would be appropriate. *See In re Langley*, 230 Or 319, 323, 370 P2d 228 (1962) (excluding from disciplinary proceeding evidence obtained in violation of state wire-tapping law). But that is not the case. It is clear from the above analysis that the Bar did not, and could not, violate Rule 6(e). Because the accused does not appear to raise the argument that exclusion would be an appropriate remedy in a lawyer disciplinary proceeding for Bar evidence that, at one point, had been disclosed wrongfully by a person subject to Rule 6(e), we do not consider that argument.

Under BR 5.1(b), which we again note that neither party cited, we now must review "the record as a whole" and determine whether the Bar has been denied a fair hearing. We have no trouble concluding that it was. The evidence that the trial panel wrongfully excluded was the bulk of the evidence that the Bar introduced in support of its allegations. Without the excluded evidence, it is undisputed that the Bar could not carry its burden of proof. We turn to the merits.

## FIRST CAUSE OF COMPLAINT

The first cause of complaint charged the accused with knowingly participating in a criminal money-laundering scheme and with violating a number of disciplinary rules (DR 1-102(A)(2), DR 1-102(A)(3), DR 7-102(A)(7), DR 7-102(A)(8)) and discipline-related statutes (ORS 9.460(1) and ORS 9.527(1)) in the process. We find by clear and convincing evidence that the Bar has proved violations of DR 1-102(A)(2), DR 1-102(A)(3), DR 7-102(A)(7), and DR 7-102(A)(8).

■        As relevant to the present proceeding, a person commits the federal crime of money laundering if: (1) the person knowingly conducts a financial transaction; (2) the transaction involves proceeds of a specified kind of unlawful activity; (3) the person knows that the money involved constituted the proceeds of the specified unlawful activity; and (4) the person knows that the transaction was designed to conceal the nature, location, source, ownership, or control of the money. *United States v. Marbella*, 73 F3d 1508, 1514 (9th Cir 1996) (construing 18 USC § 1956(a)(1)(B)(i)). Federal courts have indicated that the two knowledge elements of 18 USC § 1956(a)(1)(B)(i) are satisfied only with evidence of actual subjective knowledge. *See, e.g., United States v. Campbell*, 977 F2d 854, 857 (4th Cir 1992) (so holding).

There appears to be little question that the Bar has proved two of four of the elements in this case, *viz.*, that the accused knowingly engaged in financial transactions and that those transactions in fact involved the proceeds of unlawful activity. The accused does not deny that he repeatedly received and deposited money into his trust accounts and disbursed that money on behalf of and at the direction of Farber, and later Charlesworth, for the purchase of real property. Neither does the accused deny that, as it turns out, the money at issue in fact came from Farber's and Charlesworth's illegal drug activities.

However, the accused does dispute the Bar's contentions with respect to the remaining two elements of the crime, *viz.*, that he actually knew about the illegal source of the money and that he actually knew that the trust account transactions were designed to conceal that illegal source. On our *de novo* review of the record, we agree with the Bar that

the evidence is clear and convincing with respect to those elements. However, our analysis of those elements requires detailed discussion.

In the present proceeding, the record contains some evidence—most notably Farber's testimony—that speaks to the accused's actual subjective knowledge. However, the trial panel expressly found, and we accept, that that evidence is not credible.[15] Accordingly, we give no weight to Farber's testimony.

Ignoring Farber's testimony, then, we note the following facts with respect to the accused's relationship with Farber that lead to objectively reasonable inferences that the accused understood the purpose of those trust-account transactions and the unlawful source of those funds.

- From the facts developed during Farber's murder trial, which the accused attended, the accused knew that Farber had been involved in drug distribution activities.

- In many transactions with the accused, Farber gave him cash and cashier's checks, both of which are physically convenient and easily negotiable forms of commercial paper, to deposit in the accused's trust account. Every cashier's check was in an amount less than $10,000. Every check was payable to the accused, and the accused endorsed each check, except the cashier's check received in connection with the third purchase of real estate.

- The opening deposit to the Farber Ltd. trust account consisted of 12 cashier's checks that bore the first name of "Jim" or "J.," but had different last names. Even to the most unpracticed eye, the names appear to be a series of aliases. Those cashier's checks were made payable to the accused, and the accused endorsed each of them.

_____

[15] The Bar has asked us to depart from our ordinary practice of deferring to the trial panel's assessment of a witness's credibility with respect to the testimony of Farber in the light of three facts: (1) that Farber had nothing to gain by falsely implicating the accused at the time that Farber testified; (2) that Farber's testimony was consistent with statements that he made to law enforcement authorities shortly after his arrest; and (3) that Farber's testimony was consistent with other evidence showing that the accused understood the nature of the money that he was accepting and the purpose of his involvement. The trial panel, however, also was aware of those facts, but chose, nonetheless, to disregard Farber's testimony. The trial panel was in a superior position to judge Farber's credibility; we accept the trial panel's finding.

- The accused applied markedly different accounting practices to his deposits of Farber's funds than to his deposits of his other clients' funds. Specifically, he took "cash back" from a deposit of funds received from Farber and wrote a check on the trust account to himself. The accused maintains that he would not have withdrawn funds without Farber's permission. He has no computerized records due to a 1995 computer crash, and his wife threw out the pertinent paper records because they had been water-damaged.

- Eight days after the accused set up the Farber Ltd. trust account, Farber left the state without telling the accused beforehand. Farber took with him a check that the accused had drawn on the account for $58,200.

In his testimony before the trial panel, the accused testified that he was an unwitting dupe to a talented con man—that Farber had persuaded him that the money had come from people who wanted to invest in real estate, that he (the accused) never really had thought about Farber's purpose in wanting him to handle the money through his trust account, that Farber had paid him small amounts to draw up the various real estate contracts and did not pay him for cycling the money through his trust accounts, that he (the accused) had agreed to keep the money that Farber had collected from his "investors" in his trust account as an "accommodation" to Farber,[16] and that he had never scrutinized the cashier's checks that Farber had given him and never had concerned himself with the names or dates or amounts on those checks.

The above-described evidence certainly raises our collective eyebrow. When all the checks and all the dates are laid out together, the transactions are suspicious. This court's standard of review of clear and convincing evidence, however, demands more than merely a suspicion that a particular fact is true. *See In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985) (defining "clear and convincing evidence" as evidence establishing "that the truth of facts asserted is highly probable"). We conclude that the preceding facts relating to

---

[16] Specifically, the accused explained to the trial panel that Farber did not want the down-payment funds to have his name on them, fearing that his status as a convicted murderer would scare off potential buyers.

Farber would not, standing alone, amount to clear and convincing evidence that the accused actually knew the unlawful source of the funds and the purpose of his trust account transactions.

Against the backdrop of the suspiciousness of the accused's transactions with Farber, however, are the accused's transactions with McGuire. By his own account, the accused had no real prior relationship with McGuire, and he knew McGuire only through Farber as the real party in interest in one of Farber's real estate transactions. Yet, several weeks after Farber "cleaned out" the Farber Ltd. trust account and left the state, the accused was depositing cash and cashier's checks received from McGuire into the Farber Ltd. trust account and disbursing money from that account for McGuire's real estate purchases. The accused's explanation that he agreed to let Farber use his trust account as an accommodation does not explain why, after Farber left town, the accused would undertake a similar "accommodation" for McGuire, whom he barely knew at the time.

Most troubling of all was the manner by which the accused structured his deposits for McGuire.[17] The accused's receipt from McGuire of $76,000 in a single day and his deposit of those funds over the course two months in bundles that amounted to less that $10,000 demonstrates that the accused had become concerned about criminal exposure under 18 USC § 1957, which makes it a crime to engage in any monetary transaction involving criminally derived property having a value greater than $10,000. There was no reason for the accused to have structured the deposits as he did, unless he knew that McGuire's money was criminally derived. The accused has no explanation for his structuring of the McGuire deposits.

When combined with Farber's history of drug dealing, the suspicious nature of Farber's transactions with the accused, the fact that Farber had introduced McGuire to the accused during one of the suspicious transactions, and the fact that Farber abruptly left the state, the accused's use of the Farber Ltd. trust account for McGuire's transactions and

---

[17] See 333 Or at 527 n 5 (setting out deposit history of $76,000 transaction).

his structuring of the McGuire deposits amount to clear and convincing evidence that the accused knew that McGuire's money came from unlawful activity and that it was being cycled through his trust account to disguise that fact from the authorities. The objectively reasonable inferences from the Bar's evidence against the accused inexorably lead to the conclusion that the accused is guilty of the crime of money laundering. The Bar has proved the four elements needed to establish that crime under 18 USC § 1956(a)(1)(B)(i).

■    We conclude that, in engaging in the foregoing money-laundering crime, the accused violated a number of disciplinary rules. DR 1-102(A)(2) provides that it is unprofessional conduct for a lawyer to "[c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law." The fact that the accused committed a criminal act is established; the connection between that act and the accused's fitness to practice law is obvious. *See In re White*, 311 Or 573, 588-89, 815 P2d 1257 (1991) (explaining that only criminal acts that have rational connection to lawyer's honesty, trustworthiness, and fitness to practice law implicate DR 1-102(A)(2)). We find that the accused violated DR 1-102(A)(2).

We also conclude that, by participating in the conduct described above, the accused violated DR 1-102(A)(3), which prohibits lawyers from engaging "in conduct involving dishonesty, fraud, deceit or misrepresentation." As the Bar notes, the whole point of the accused's participation in the money-laundering scheme was to disguise the fact that McGuire's funds were the proceeds of unlawful activities. Such conduct involves dishonesty.

In its alternative findings, the trial-panel majority found that, by violating 18 USC § 1956, the accused also had violated DR 7-102(A)(7) and (8). DR 7-102(A)(7) provides that, "in the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not * * * counsel or assist the lawyer's client in conduct that the lawyer knows to be illegal or fraudulent." DR 7-102(A)(8) provides that, "in the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not

* * * knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule."

We agree that the accused's conduct violates both those disciplinary rules. The record clearly demonstrates that the accused not only assisted his client McGuire in a scheme that he knew to be illegal, but also knowingly engaged in illegal conduct, *i.e.*, money laundering, himself.

In connection with its first cause of complaint, the Bar asks us to address two statutory provisions that the trial panel declined to address in its alternative findings. In particular, the Bar asks us to find that, in violating 18 USC § 1956, the accused also violated ORS 9.460(1) (requiring lawyers to "support the Constitution and laws of the United States and of this state") and ORS 9.527(4) (providing that this court may disbar, suspend, or reprimand lawyer whenever it appears to court that lawyer "is guilty of willful deceit or misconduct in the legal profession").

In *In re Kimmell*, 332 Or 480, 31 P3d 414 (2001), this court stated that, in lawyer disciplinary proceedings, the Bar no longer should charge violations of ORS 9.527, at least in circumstances in which the acts allegedly constituting the statutory violation also would constitute the violation of a disciplinary rule. Accordingly, we will not consider the alleged violation of ORS 9.527(4).

We also decline to consider whether the accused's conduct violated ORS 9.460(1). Although the *Kimmell* court's analysis of ORS 9.527 also may apply to ORS 9.460, we conclude that, under the circumstances, it is unnecessary to decide that issue here. We already have found that the accused violated four disciplinary rules—DR 1-102(A)(2), DR 1-102(A)(3), DR 7-102(A)(7), and DR 7-102(A)(8)—by engaging in the conduct at issue. As will be seen, the sanction that we impose for those violations would not be enhanced if such misconduct also were a violation of ORS 9.460(1). *See In re Recker*, 309 Or 633, 638, 789 P2d 663 (1990) (declining to resolve dispute about whether conduct that had been found to violate DR 1-102(A)(3) also violation of DR 7-102(A)(5), because sanction for first violation would not be enhanced by second finding).

## FOURTH CAUSE OF COMPLAINT[18]

Finally, the Bar argues that it has proved its fourth cause of complaint, which the trial panel characterized as alleging that the accused assisted in Charlesworth's conversion of funds belonging to Farber's and McGuire's/Charlesworth's supposed investors. The trial panel rejected that allegation, based on its finding that the money at issue belonged to Farber and McGuire/Charlesworth, and not to third-party investors.

The Bar does not contest that finding, as far as it goes. However, the Bar argues that the trial panel's decision is incomplete because it does not address another allegation in the fourth cause, *viz.*, that the accused converted to his own use funds that had been entrusted to him by his clients Farber and McGuire. *See* DR 9-101(A) (requiring client funds to be deposited and maintained in lawyer trust account). In that regard, the Bar notes that there was no fee agreement between the accused and Farber or McGuire, and that the accused was not authorized to help himself to the funds that had been entrusted to him. The Bar further argues that the accused, in fact, did help himself to those funds on a regular basis, by: (1) taking some $3,850 in cash back from deposits; (2) writing checks to himself or to cash on the Farber Ltd. trust account to a total of $10,250; and (3) failing to deposit all the cashier's checks that McGuire had entrusted to him into the Farber Ltd. trust account.

---

[18] The Bar included a second cause in its formal complaint, alleging that the money that the accused deposited into his trust accounts was drawn from the funds of third-party investors and that the accused had paid all that money over to Farber without the knowledge or consent of those third parties. The trial panel rejected the allegations in that second cause on the ground that the money, in fact, belonged to Farber and McGuire, and not to third-party investors. The Bar also included a third cause alleging that the accused had deposited a retainer given to him by another client into the Farber Ltd. trust account and that he had converted some or all that retainer to his own use. The trial panel rejected that cause on the grounds that: (1) the client who had given the accused the money never had complained; and (2) the records that would show the accused's accounting for the money had been discarded or destroyed. The Bar does not challenge the trial panel's findings with regard to the second and third causes, and we do not address those causes in this decision.

The accused responds, first, that the Bar belatedly and unfairly is changing its case. Originally, the Bar had alleged and argued that the accused converted money belonging to supposed third-party investors by disbursing that money for Farber's and McGuire's use without obtaining the investors' consent. Now, the Bar is charging that the accused converted money entrusted to him by Farber and McGuire to his own use. The accused suggests that he has not received fair notice of the latter charge and, therefore, cannot be found guilty on those grounds. The accused further urges that the evidence on which the Bar relies is not persuasive because it attempts to take unfair advantage of his loss of the records that could show where the money had gone. Finally, he argues that there is no evidence in the record to counter his own general testimony that whatever money was taken from the trust account was taken pursuant to Farber's or McGuire's instructions.[19]

■   We are not persuaded by the accused's "fair notice" argument. Although we would agree with him that the allegations in the fourth cause are directed primarily at the notion that the accused assisted or acquiesced in Charlesworth's conversion of funds belonging to third-party investors, they also clearly charge that the accused converted at least some of the funds that were entrusted to him to his *own* use.[20] Moreover, the Bar clearly made an issue of the accused's "cash-back" transactions and his personal withdrawals from the Farber Ltd. trust account in its memorandum to the trial panel.

---

[19] The accused testified that he did not remember the particulars of any cash-back or personal-withdrawal transaction, but that any money that he would have taken out of the trust account would have been with Farber's or McGuire's authorization.

[20] In that regard, we note that the fourth cause alleges, among other things:

"After January, 1988, the Accused received cash or cashier's checks that were payable to or drawn on the funds of Craig Rurey, Jim Anderson, Jim Robinson and Jim Pierson. The Accused deposited these funds into his lawyer trust account. After May 9, 1989, the Accused received cash or cashiers' checks that were payable to or drawn on the funds of Brian Charlesworth, David McGuire and Brian Lee. The Accused did not deposit these funds into his trust account, but deposited and maintained them in the Farber trust account.

"*Between January, 1988, and November, 1990, the Accused converted to his own use at least $1,250 of the funds described in paragraph 20. * * *"*

(Emphasis added.)

■    Still, we are not persuaded by the requisite clear-and- convincing-evidence standard that those transactions amounted to conversion. We first focus on the alleged conversions with regard to funds belonging to Farber. The accused took $500 cash back from a deposit of funds that Farber had given him and wrote himself a check for $1,000 a few days after that deposit. The accused's explanation that those transactions were with Farber's permission is plausible, as those amounts appear to be reasonable fees in relation to the legal services that the accused provided Farber. Other evidence in the record—the accused's wife's testimony and a letter from a computer technician—corroborate the accused's testimony that he had lost his own copies of his trust-account records. For the above-described reasons, as to Farber, we conclude that the Bar has failed to sustain its burden of proof with respect to the DR 9-101(A) charge.

As to the accused's taking cash back and withdrawals of funds belonging to McGuire, our reasoning for concluding that the Bar has failed in its proof differs. As discussed above, we conclude that the accused was assisting McGuire in a criminal enterprise. In the absence of any clear evidence as to how the accused was being compensated for that assistance, there is another equally plausible explanation for the transactions at issue—that McGuire had authorized them to compensate the accused for his money-laundering activities. Ultimately, then, the evidence in the record is insufficient to support the charges in the fourth cause of complaint, *i.e.*, mishandling or conversion of client funds.

## SANCTION

■    We have determined that the accused violated a number of ethical rules in laundering proceeds from illegal activity. In determining the appropriate sanction, this court initially weighs three considerations: the duty violated; the accused lawyer's mental state; and the actual or potential injury caused by the accused lawyer's misconduct. *In re Devers*, 328 Or 230, 241, 974 P2d 191 (1999); ABA Standard 3.0. We then examine any aggravating or mitigating circumstances to determine if the sanction should be adjusted. *Devers*, 328 Or at 241; ABA Standard 3.0. Finally, we compare prior Oregon cases and the sanctions imposed in them. *Devers*, 328 Or at 241.

The accused violated his duty to the public to maintain the standards of personal integrity upon which the community relies. ABA Standard 5.0. By participating in the money-laundering scheme as described in this opinion, he engaged in criminal conduct of a type that reflects adversely on his honesty, trustworthiness, and general fitness to practice law.

The accused's money-laundering activities were both knowing and intentional. They were performed with conscious awareness of the attendant circumstances that made the conduct illegal and also with the conscious intent of concealing from federal authorities the true nature of the transactions. *See* ABA Standards at 7 (so defining "knowledge" and "intent").

By violating the federal money-laundering statutes, the accused caused actual injury to the public by helping drug dealers circumvent laws designed to assist in the detection of crime.

Having considered those factors, we again turn to the ABA Standards. The provision that pertains to violations of duties owed to the public appears most germane. ABA Standard 5.11. That standard provides:

"Disbarment is generally appropriate when:

"(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

"(b) *a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation*

*that seriously adversely reflects on the lawyer's fitness to practice of law."*

(Emphasis added.)

Under that standard, the appropriate sanction in this instance is disbarment, unless some mitigating circumstance or prior case law suggests a less drastic sanction. The trial panel expressly found that there are no mitigating circumstances, and the accused does not advance any grounds for mitigation. Our case law also supports disbarment in this proceeding: In the past, Oregon lawyers who have engaged in serious criminal misconduct, even without conviction, generally have been disbarred. *See In re Leonhardt*, 324 Or 498, 511, 930 P2d 844 (1997) (noting that history and citing illustrative cases). We conclude that the appropriate sanction for the accused's misconduct is the same.

The accused is disbarred, effective 60 days from the date of the filing of this decision.

**DURHAM, J.,** dissenting.

I respectfully dissent from the majority's decision to disbar the accused due to the Bar's allegation that the accused violated the federal money-laundering statute, 18 USC § 1956 (1988), with respect to certain funds that he received from a client, Charlesworth, who used an alias, "David McGuire," among other aliases.

I agree with the majority's decision to dismiss all money-laundering charges against the accused under the first cause of complaint that arise from his financial transactions with his client Farber. The evidence fails to prove those claims.[1] I also agree with the majority's decision to dismiss in their entirety the Bar's charges against the accused under the fourth cause of complaint. The trial panel dismissed the Bar's second and third causes of complaint. The Bar does not seek review in this court of those determinations of the trial

---

[1] It is worth noting that the majority's decision to dismiss the Bar's money-laundering charges involving the accused's dealings with Farber signifies that the majority concludes that a significant part of the evidence on which the trial panel relied in determining that the accused was guilty *does not* provide clear and convincing evidence that the accused violated the money-laundering statute.

panel. As a result of the foregoing, the only remaining disputed charge against the accused is the Bar's claim, under the first cause of complaint, that the accused engaged in money laundering, in violation of the federal statute, in connection with the manner in which he dealt with money that he received from Charlesworth.

In deciding the Bar's claim regarding the accused's handling of Charlesworth's money, the majority overrules the accused's objection that the Bar's evidence regarding that claim largely consists of secret grand jury records that Federal Rule of Criminal Procedure 6(e) renders inadmissible. I do not address the merits of that objection. Assuming arguendo that the challenged grand jury records are admissible, the record evidence, viewed as a whole, is insufficient to prove by clear and convincing evidence that the accused violated the federal money-laundering statute in receiving or depositing Charlesworth's money.

I will begin by reviewing briefly the pertinent federal statute, the standard that applies to the knowledge element of the federal statute, and the Bar's factual allegations regarding Charlesworth. In 1986, Congress passed the Money Laundering Control Act, codified principally at 18 USC §§ 1956, 1957. The Bar alleged that the accused engaged in criminal acts in violation of the following pertinent parts of 18 USC § 1956 (1988):

> "(a)(1)  Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

> "* * * * *

> "(B)  knowing that the transaction is designed in whole or in part—

> "(i)  to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;

> "* * * * *

"shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

"* * * * *

"(c)   As used in this section—

"(1)   the term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State or Federal law, regardless of whether or not such activity is specified in paragraph (7)."

The element of the actor's *knowledge* is a key component of the federal statute and of the Bar's case against the accused. According to the Bar:

"Whether the Accused committed the crime of money-laundering thus turns on the third and fourth elements of 18 USC § 1956(a)(1)(B)(i): whether he *knew* that he was assisting Farber and 'McGuire' with transactions designed to conceal or disguise the 'nature, location, source, ownership or control' of proceeds derived from illegal activities. The Bar claims that he did; the Accused denies it."

(Emphasis in original.)

The money-laundering statute is federal law. Thus, this court is bound to follow federal law in construing the statute. All pertinent federal cases that the parties cite confirm that 18 USC § 1956(a)(1)(B)(i) requires proof that the actor had *actual, subjective knowledge* that (1) the property in question represents the proceeds of illegal activity and (2) the transaction is designed to disguise the nature of those proceeds. *See, e.g., United States v. Campbell*, 977 F2d 854, 857 (4th Cir 1992) (illustrating principle). The statutory knowledge requirement prohibits conviction on the basis of an actor's negligent failure to learn the pertinent facts, or on what the actor objectively should have known. *Id.*

The federal courts have softened the actual knowledge requirement somewhat by permitting proof of actual

knowledge under the doctrine of willful blindness. Under that doctrine, the government can impose criminal liability on a person who, while recognizing the likelihood that the facts pertinent to money laundering are present, nonetheless consciously refuses to take basic investigatory steps to discover what otherwise would be obvious. *United States v. St. Michael's Credit Union*, 880 F2d 579, 585 (1st Cir 1989). The willful blindness doctrine requires the government to establish that the actor had a conscious purpose to avoid enlightenment. *United States v. Barnhart*, 979 F2d 647, 651 (8th Cir 1992). Additionally, willful blindness requires proof that the actor took deliberate actions to prevent the obtaining of actual knowledge of the facts. *Id.* In explaining that aspect of the willful blindness doctrine, the court in *Barnhart* stated:

> "However, the instruction [on willful blindness] should not be given out in all cases because, despite the instruction's cautionary disclaimer, there is a ' "possibility that the jury will be led to employ a negligence standard and convict a defendant on the impermissible ground that he should have known [an illegal act] was taking place." ' *United States v. White*, 794 F.2d 367, 371 (8th Cir. 1986) (quoting *United States v. Beckett*, 724 F.2d 855, 856 (9th Cir. 1984) (per curiam)). Consequently, if the evidence in the case demonstrates only that the defendant either possessed or lacked actual knowledge of the facts in question—and did not also demonstrate some deliberate efforts on his part to avoid obtaining actual knowledge—a willful blindness instruction should not be given. [Citations omitted.] More succinctly, the instruction should not be given unless there is evidence to

>> " 'support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution.' [*United States v. Rivera*, 944 F2d 1563, 1571 (11th Cir 1991).]

> "* * * * *

> "In order for a defendant's ignorance to be deliberate or willful, the defendant must have been presented with facts that put him on notice that criminal activity is probably

afoot, and then the defendant must have failed to investigate those facts, thereby deliberately declining to verify or discover the criminal activity."

979 F2d at 651-52.

In *Campbell*, the Fourth Circuit summarized the government's burden in attempting to prove actual, subjective knowledge through the willful blindness doctrine by reciting the following jury instruction:

"The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed her eyes to what would otherwise have been obvious to her. A finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred upon willful blindness to the existence of a fact.

"It is entirely up to you as to whether you find any deliberate closing of the eyes and inferences to be drawn from any evidence. A showing of negligence is not sufficient to support a finding of willfulness or knowledge.

"I caution you that the willful blindness charge does not authorize you to find that the defendant acted knowingly because she should have known what was occurring when the property at 763 Sundown Road was being sold, or that in the exercise of hindsight she should have known what was occurring or because she was negligent in failing to recognize what was occurring or even because she was reckless or foolish in failing to recognize what was occurring. Instead, the Government must prove beyond a reasonable doubt that the defendant purposely and deliberately contrived to avoid learning all of the facts."

*Id.* at 857.[2]

---

[2] The majority of the trial panel found as a fact that the facts surrounding the Farber and "McGuire" trust account deposits "would have caused the accused and any reasonable person to question the source of funds." I agree that the accused either should have known what was occurring or was negligent or reckless in failing to recognize what was occurring. But, as the *Barnhart* and *Campbell* decisions demonstrate, those observations about the accused's behavior are insufficient to satisfy the actual knowledge or willful blindness requirements of the federal statute.

The Bar's second amended complaint set out separate factual allegations regarding the accused's dealings with his clients, Farber and Charlesworth. The Bar alleged the following facts to establish that the accused engaged in money laundering in connection with his dealings with Charlesworth's money:

"5.

"Beginning in 1989, the Accused represented an individual, who was using the name 'David McGuire', in the purchase of several parcels of real property. The Accused knew that 'David McGuire' was an alias for a drug dealer who was associated with Farber and was also engaged in the sale of illegal drugs. The true name of 'David McGuire' was Brian Charlesworth (hereinafter referred to as 'Charlesworth').

"6.

"On or about May 1, 1989, the Accused established a separate client trust account for Farber (hereinafter referred to as the 'Farber account').

"7.

"Beginning in about July, 1989, Charlesworth, using the name David McGuire, delivered funds to the Accused in the form of cash and cashiers' checks payable to David McGuire, Brian Charlesworth or third persons. The Accused knew or had reason to know that these funds were the proceeds from the sale of illegal drugs, that the deposit of these funds into the Farber trust account, and that the real property purchases were intended to disguise the source of the funds.

"8.

"At the instruction of both Farber and Charlesworth, the Accused prepared and later recorded land sale contracts that named as vendees persons other than Farber or Charlesworth. The representations in the land sale contracts that the vendees were persons other than Farber or Charlesworth were false and the Accused knew they were false when he made them."

In determining whether the accused violated 18 USC § 1956(a)(1)(B)(i) in dealing with Charlesworth's money, this court considers the evidence *de novo*. ORS 9.536(3). The Bar has the burden to establish the alleged misconduct by clear and convincing evidence. BR 5.2. For purposes of a disciplinary proceeding, evidence is clear and convincing when the truth of the facts asserted by the Bar is highly probable. *See In re Blaylock*, 328 Or 409, 411, 978 P2d 381 (1999) (stating that definition).

With the foregoing federal statutory scheme and factual allegations in mind, I turn to the evidence presented in this case. The Bar contends that, in 1987, 1988, and 1989, the accused willingly agreed, first with Farber and later with Charlesworth, to receive from them and deposit into his trust account cash and checks that were the proceeds of illegal drug transactions and to issue trust account checks to pay for real estate purchases to disguise the true nature of the drug money. By contrast, the accused contends that Farber and Charlesworth were career criminals and accomplished liars who deceived the accused (and several other persons) about the sources of their funds, the nature of their businesses, and their purpose in purchasing various parcels of real property.

The record contains comparatively little evidence concerning the accused's relationship with Charlesworth, *i.e.*, "David McGuire." According to the record, the accused first encountered Charlesworth in about 1988. Farber introduced Charlesworth to the accused as "David McGuire" and said that "McGuire" was one of Farber's wealthy real estate investors. Farber also explained that "McGuire" valued his privacy and wished to leave the details of his property transactions to others. Farber later purchased a parcel of real estate in the name of "McGuire" with the accused's legal assistance, but the accused did not perform any legal services for "McGuire," directly, until after May 1989.

Soon after Farber's May 9, 1989, trust account withdrawal, "McGuire" contacted the accused. He indicated that he was seeking a lawyer to provide legal services of the kind that the accused had provided to Farber, and asked the accused to help him. The accused agreed. There is no evidence that "McGuire" discussed any business of an illegal

nature with the accused at that or any other time. Nothing in the facts known to the accused indicated that the accused had any good reason *not* to represent "McGuire."

After contacting the accused, "McGuire" left several trust account deposits of cash or checks with the accused, just as Farber had done, and the accused disbursed funds from the trust account, at "McGuire's" request, to pay for real estate purchases, just as he had done for Farber.

However, the majority concludes that the accused's handling of one sum of $76,000, received from "McGuire" on July 18, 1989, indicates that the accused "knew that McGuire's money was criminally derived." 333 Or at 540. According to the majority, the accused "structured" the deposits of that money, as demonstrated by what the majority describes as several subsequent deposits to the trust account over the next two months in sums of less than $10,000. On the basis of that conclusion, the majority decides that the accused engaged in money laundering and orders his disbarment.

In my view, clear and convincing evidence does not support the majority's conclusion. The record contains a copy of a sheet of the accused's letterhead, introduced into evidence by the accused, on which he had written by hand:

"July 18, 1989

"Received $76,000 today from David McGuire to hold in trust for him for investments.

"Nick Albrecht."

The record, however, contains virtually no other evidence about that money. The Bar did not call Charlesworth ("McGuire") as a witness, perhaps because of his criminal involvement.

The record also contains copies of several cashier's checks, dated after July 18, 1989, that the accused or his wife deposited in the accused's trust account. However, the checks follow no telltale pattern of the sort that the majority perceives. Several checks list the purchaser as "David McGuire," "Nick Albrecht," other individuals, or "cash." Several checks list no purchaser. Several of the trust account documents

either are illegible or display a deposit amount with no other discernible information. One check deposited "$37,500," thus undermining at least part of the factual inference on which the majority seeks to rely. None of the amounts deposited corresponds with the $76,000 that the accused received on July 18, 1989.

The doubts engendered by those significant gaps in the financial records are magnified by the failure of the Bar to ask any questions of the accused regarding the deposits to his trust account after July 18, 1989. The Bar did not ask the accused any questions about the $76,000, whether it consisted of a single check or multiple checks or cash, what it was for, or whether or how the accused deposited it in trust. In my view, the answers to those unasked questions are critical to a clear understanding of the state of the accused's actual knowledge regarding the sources of Charlesworth's money.

Other factors also contribute to the difficulty of reconstructing "McGuire's" financial transaction with the minimal records before the court. The Bar hearing occurred approximately nine years after the accused's dealings with "McGuire." The passage of time affected the memory of several witnesses.

The accused also suffered a significant loss of his office records as a result of a computer malfunction in 1995. According to uncontradicted evidence, a power surge destroyed the hard drive in the accused's computer and rendered several thousand pages of typed text unrecoverable. The computer formerly contained entries regarding the accused's trust account deposits. All attempts to recover the lost data were unsuccessful.

The record evidence falls well short of demonstrating, as required by the federal law reviewed above, that the accused had actual subjective knowledge that the $76,000 was the product of criminal activity. Contrary to the Bar's allegation, the accused did not learn, until years later, that "David McGuire" was an alias and that his client's true name was Charlesworth. The record contains no credible evidence that the accused ever learned, until years later, that

Charlesworth was purchasing real property with the proceeds of drug sales.

Moreover, the record contains no evidence that the accused consciously took steps to avoid acquiring actual subjective knowledge about Charlesworth's illegal activities. From all that appears, the accused's conduct with respect to Charlesworth was indistinguishable in kind from his conduct with respect to Farber. None of that conduct indicates that the accused intentionally planned his activities to avoid learning the truth about his clients.

As noted above, the record justifies at least a degree of suspicion about the accused's behavior. The accused's trust account practices at the pertinent time were far less than ideal, although his computer back-up system, which he lost in 1995 by accident, might have supplied much needed organization to his trust account records. But *all* of the accused's clients experienced the inadequacies of his trust account record keeping, not only Farber and Charlesworth. There is no basis for concluding that the accused employed lax or incomplete record keeping solely to assist Farber and Charlesworth.

Ultimately, the evidence about what the accused subjectively knew about Charlesworth's activities is inconclusive. On this record, I cannot conclude that the evidence proves that it is "highly likely" that the accused knew that the $76,000 that he received from Charlesworth on July 18, 1989, was the product of criminal activity. The record contains *no* evidence about the accused's knowledge regarding the source of that money.

I agree with the trial panel chairperson, who opined in his dissent below that, although the accused may be guilty of the Bar's money-laundering charge, the record fails to prove that charge by clear and convincing evidence. Because the Bar failed to prove the accused's involvement in laundering Charlesworth's money by clear and convincing evidence, I would dismiss that aspect of the Bar's first cause of complaint.

I respectfully dissent.