Argued and submitted November 1, the accused is suspended from the practice of law for a period of one year, commencing 60 days from the date of filing of this decision December 15, 2005

# In re Complaint as to the Conduct of

# GRAEME H. STRICKLAND, JR.,
*Accused.*

## (OSB 04-32; SC S52490)

124 P3d 1225

Graeme H. Strickland, Jr., Lake Oswego, argued the cause and filed the briefs for himself.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

**PER CURIAM**

In this lawyer disciplinary proceeding, the Oregon State Bar charged the accused with violating ORS 9.527(2) and Oregon Code of Professional Responsibility Disciplinary Rules (DR) 1-102(A)(2) and DR 1-102(A)(3).[1] Those charges stemmed from the accused's criminal convictions for improper use of the emergency reporting system, ORS 165.570; initiating a false report, ORS 162.375; and disorderly conduct, ORS 166.025. A trial panel of the Disciplinary Board concluded that the accused was guilty of all charges, and it imposed a three-year suspension from the practice of law. The accused sought review pursuant to ORS 9.536(1). We review bar disciplinary matters *de novo*. ORS 9.536(2); BR 10.6.

## I. FACTS

The accused is licensed in four states and has been a member of the Bar since 1973. During most of that time, he worked for the Oregon Employment Department as a hearings officer and for the Oregon Court of Appeals as a part-time mediator. The only case that he handled as a lawyer representing a client in the last 10 years concluded in 2001. The accused represented his mother in that case.

We find that the Bar has proved the following facts by clear and convincing evidence. In August 2002, the accused learned that the City of Lake Oswego (city) was planning to build a reservoir across the street from the house where he lives with his mother. During the remainder of 2002 and the first part of 2003, the accused observed the construction workers, took pictures, and recorded notes in a journal. In October, he wrote several letters to the city's attorney and the city's contractor, Emery Construction, putting them "on notice," presumably of a potential tort claim. The letters increased both in urgency and frequency. The record reflects that, in February and March 2003, the accused wrote at least 10 separate letters, complaining of disturbances from the

---

[1] The Oregon Rules of Professional Conduct became effective January 1, 2005. Because the conduct at issue here occurred before that date, the Oregon Code of Professional Responsibility applies.

construction workers, including noise, vibrations, a nail left in the road, and a truck parked in front of his mailbox. In the final three letters of March 2003, the accused complained that Emery workers were "retaliat[ing]" against him.

On the morning of March 31, 2003, the accused felt vibrations in his home that he associated with the nearby construction work. He drove several blocks to a nearby intersection to observe the construction and parked his car in the middle of that intersection. An Emery worker asked him to move because he was parked in a work zone.[2] Rather than moving the car, the accused left the car in the intersection and walked back to his home.

On arriving home, the accused dialed 9-1-1, and the following conversation ensued:

"[Dispatcher]: Nine, one, one * * * police, fire or medical?

"[Accused]: I'm at Spruce and Larch Street in Lake Oswego, I need some police quick.

"[Dispatcher]: Well what's the problem there[,] sir?

"[Accused]: I've been, vehicles have surrounded me, construction vehicles, I need some help quick.

"[Dispatcher]: Okay, construction vehicles have surrounded you?

"[Accused]: Yeah, at Spruce and Larch.

"[Dispatcher]: What do you mean, surrounded you?

"[Accused]: That's exactly what I said, just get some police up here quick.

"[Dispatcher]: Sir, is anybody there threatening you?

"[Accused]: Yes.

"[Dispatcher]: Threatening in what way?

---

[2] The parties dispute whether the accused actually parked in the work zone or whether he parked adjacent to it. We need not decide that factual question, because it does not affect our analysis of the alleged violations in this case.

"[Accused]:      Told me to get the hell out of the, told me I was blocking the road construction site, I'm at, I'm at, Larch and Aspen get the hell up here quick.

"[Dispatcher]:   I, sir, we're getting somebody on the way.

"[Accused]:      Thank you[.]

"[Dispatcher]:   Is there any thing physical that has occurred[?]"

The transcript indicates that the conversation then ended.

The accused then returned to the intersection, where an Emery worker, Atiyeh, was walking down the street intending to speak to his foreman about the accused. Atiyeh's hands were in his pockets. When Atiyeh passed the accused, the accused carefully set his camera on the ground and lunged at him. The accused, who made no physical contact with Atiyeh, fell backwards to the ground and began screaming that his back was injured.

A Lake Oswego police officer arrived, with sirens and lights flashing, to find the accused on the ground screaming. The accused told the officer that Atiyeh had assaulted him and thrown him to the ground, injuring his back. The officer notified him that making a false police report is a criminal act. The accused persisted in his story and refused to leave.

Paramedics then arrived. The accused told them that Emery workers had assaulted him. The accused then appeared to have a seizure, stiffening and trembling. Immediately thereafter, he sat up, appeared alert, and said that he was going home. The attending paramedic believed that the accused had feigned the seizure because such rapid recovery is not consistent with seizures. However, because the paramedics could not determine what was happening, and because the accused continued to state that he was in pain, they transported the accused to the emergency room. Doctors there found no evidence of physical injury.

In connection with the above events, the accused was charged with and convicted by a jury of three misdemeanors in Lake Oswego Municipal Court: violation of ORS

165.570 (improper use of emergency reporting system),[3] ORS 162.375 (initiating a false report),[4] and ORS 166.025 (disorderly conduct).[5] The accused appealed to the circuit court, where another jury found him guilty.

The accused reported his convictions to the Bar.[6] The Bar charged him with violating ORS 9.527(2), DR 1-102(A)(2), and DR 1-102(A)(3) as to each of the three crimes. The accused stipulated that his convictions for initiating a false report and for disorderly conduct constituted violations of the statute and the rules, but he disputed the Bar's claim that his conviction for improper use of the emergency reporting system provided a basis for disciplinary action. The trial panel determined that the accused had committed all of the violations that the Bar had charged and imposed a three-year suspension.

## II.   ANALYSIS OF VIOLATIONS

As the trial panel noted, the accused stipulated at the disciplinary hearing that his convictions for initiating a false report and disorderly conduct violate DR 1-102(A)(2) and (3). We accept that stipulation and consider only the

---

[3] ORS 165.570 provides, in part:

"(1) A person commits the crime of improper use of an emergency reporting system if the person knowingly:

"(a) Calls a 9-1-1 emergency reporting system * * * for a purpose other than to report a situation that the person reasonably believes requires prompt service in order to preserve human life or property[.]"

[4] ORS 162.375(1) provides, in part:

"A person commits the crime of initiating a false report if the person knowingly initiates a false alarm or report which is transmitted to a fire department, law enforcement agency or other organization that deals with emergencies involving danger to life or property."

[5] ORS 166.025 provides, in part:

"(1) A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:

"* * * * *

"(f) Initiates or circulates a report, knowing it to be false, concerning an alleged or impending fire, explosion, crime, catastrophe or other emergency[.]"

[6] The accused also reported his convictions to the state bars of each of the other three states where he is licensed. According to the accused, those jurisdictions intend to impose reciprocal discipline based on the outcome of this proceeding.

appropriate sanction for those violations. *In re Murdock*, 328 Or 18, 24 n 1, 968 P2d 1270 (1998) (considering only the appropriate sanction when an accused stipulated to the charged violations). We now address whether the accused's conviction for violating ORS 165.570, improper use of the emergency reporting system, also violated those disciplinary rules.

■■ DR 1-102(A)(2) provides that it is professional misconduct for a lawyer to "[c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law." The accused's conviction for violating ORS 165.570 is clear and convincing evidence that he committed a "criminal act." A lawyer's criminal act does not violate DR 1-102(A)(2) unless there is "some rational connection other than the criminality of the act between the conduct and [the lawyer's] fitness to practice law." *In re White*, 311 Or 573, 589, 815 P2d 1257 (1991). We determine whether that "rational connection" exists by considering the lawyer's mental state, the extent to which the act demonstrates disrespect for the law or law enforcement, the presence or absence of a victim, the extent of actual or potential injury to a victim, and whether the act is part of a pattern of criminal conduct. *Id.*

■ Several of those factors are particularly relevant here. First, we note that the conviction required that the accused at least have acted knowingly. A criminal defendant acts "knowingly" when he "acts with an awareness that [his conduct] is of a nature so described or that a circumstance so described exists." ORS 161.085(8). In other words, the accused's conviction demonstrates, at a minimum, that the accused understood that he was using the 9-1-1 system to report activities that he did not reasonably believe required prompt emergency service "in order to preserve life or property." ORS 165.570(1). Second, the accused showed disrespect for law enforcement by summoning law enforcement officers on false pretenses. Third, misuse of the 9-1-1 system was part of a pattern of criminal conduct because the accused summoned the police in order to deliver a false report, another criminal act. On that basis, we find that the evidence in the record shows a "rational connection" between the accused's conviction for improper use of the emergency

reporting system and his fitness to practice law. Therefore, we conclude that that conviction violated DR 1-102(A)(2).

■ DR 1-102(A)(3) provides that it is professional misconduct for a lawyer to "[e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." When the accused called the 9-1-1 operator, he described himself as being currently "surrounded" by construction vehicles. He said that the construction workers were "threatening" him, and he conveyed the impression that they were about to use physical violence against him. None of those things was true. The record establishes that no threats occurred and that, at the time that he placed the call, the accused was safely in his own home, blocks away from the construction site. We find by clear and convincing evidence that the accused engaged in conduct involving dishonesty in violation of DR 1-102(A)(3).

## III. SANCTION

We have determined that the accused violated DR 1-102(A)(2) and DR 1-102(A)(3).[7] We now consider the appropriate sanction. In determining a sanction, this court refers to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) and this court's case law. The ABA Standards consider the duty that the accused lawyer violated, his mental state, the extent of any actual or potential injury caused by the accused, and any applicable aggravating and mitigating factors. We also consider this court's prior case law.

### A. *Duty Violated*

The accused violated his duty to the public to maintain personal integrity. ABA Standard 5.1.

---

[7] The Bar also charged the accused with violating ORS 9.527(2). We do not consider that alleged violation because, as this court has stated before, "the Bar no longer should charge violations of ORS 9.527, at least in circumstances in which the acts allegedly constituting the statutory violation also would constitute the violation of a disciplinary rule." *In re Albrecht*, 333 Or 520, 542, 42 P3d 887 (2002) (declining to address alleged violation of ORS 9.527(4)); *see also In re Kimmell*, 332 Or 480, 487, 31 P3d 414 (2001) (declining to address alleged violation of ORS 9.527(1)). In this case, the trial panel found the accused guilty of violating ORS 9.527(2), but it did not use that determination to enhance the sanction because the same conduct also constituted a violation of other disciplinary rules.

## B. *The Accused's State of Mind*

As the statutes quoted above make clear, convictions for false reporting and improper use of the emergency reporting system require at least a "knowing" state of mind. An accused acts knowingly under the ABA Standards when he has "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards at 17. The Oregon criminal standard for a "knowing[ ]" mental state articulated in ORS 161.085(8) and the ABA standard for "knowing" conduct describe the same state of mind. Therefore, as to the convictions for false reporting and improper use of the emergency reporting system, the record establishes that the accused acted with at least a knowing state of mind.

ORS 166.025 provides, in part, that a defendant commits disorderly conduct if he "[i]nitiates or circulates a report, knowing it to be false, concerning an alleged or impending * * * emergency" with "intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof[.]" The accused's criminal complaint clarifies that he was charged with "recklessly creating a risk" of public inconvenience, not with intentionally causing a public inconvenience. For the purpose of Oregon criminal statutes, a person acts "recklessly" when that person "is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists." ORS 161.085(9). The ABA Standards do not recognize a "reckless" state of mind, but that state, as defined above, is most similar to "negligence" as defined by the ABA Standards. The standards define "negligence" as "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." ABA Standards at 7. Therefore, in carrying out the acts that led to his conviction for disorderly conduct, the accused's conviction itself establishes that the accused at least acted "negligently" for purposes of the sanctions determination.

■ However, neither of the disciplinary rules that the accused violated requires us to limit our analysis of his mental state to the text of the accused's criminal complaint for the

underlying crimes. DR 1-102(A)(3) requires no underlying criminal conviction at all. DR 1-102(A)(2) requires a "criminal act," which, as we have stated before, is not the same as a criminal conviction. *See In re Allen*, 326 Or 107, 120, 949 P2d 710 (1997) ("Under DR 1-102(A)(2), the court examines the accused's criminal act, not a criminal conviction."). Therefore, if the Bar proves by clear and convincing evidence at a hearing that the accused acted with a more culpable mental state than his crimes of conviction required, then the trial panel, and this court on review, may base the sanction on that more culpable mental state.

The ABA Standards define "intent" as "the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. In this case, we find that the accused acted with intent when he violated DR 1-102(A)(2) and DR 1-102(A)(3). The many letters that the accused sent to the city and Emery prior to March 31, 2003, show that he was upset about the construction and that he was preparing to sue the city and Emery Construction. His actions to document the progress of the construction through photographs and journal notes, while not blameworthy behavior of themselves, further suggest that the accused was preparing for legal action against those parties. On March 31, he repeatedly lied to emergency personnel about the nature of his dispute with the Emery workers, the degree of danger that he faced, the actions of the Emery workers, and his own medical condition. He deliberately feigned being assaulted. The most likely inference from that evidence is that the accused had the conscious objective or purpose to lie in order to advance the lawsuit for which he had been preparing. In fact, the evidence in the record bears no other reasonable inference. Therefore, we conclude that the accused acted with intent when he committed criminal acts that "reflect[ed] adversely on [his] honesty, trustworthiness or fitness to practice law," DR 1-102(A)(2), and that he intentionally "[e]ngage[d] in conduct involving dishonesty, fraud, deceit or misrepresentation" in violation of DR 1-102(A)(3).

C. *Potential or Actual Injury Caused by the Accused's Misconduct*

The accused's actions caused actual and potential injury to the city and potential injury to Atiyeh. The accused actually injured the city by needlessly inducing it to expend

its resources by sending police and paramedics to the scene. He potentially injured the city because, in summoning the city's limited emergency personnel, he created the risk that the city would not have the resources to respond to actual emergencies. The accused potentially injured Atiyeh by creating the risk that Atiyeh would be charged with an assault that he did not commit.

D. *Preliminary Sanction*

■  A preliminary sanction of disbarment is warranted when a lawyer engages in "serious criminal conduct, a necessary element of which includes * * * false swearing, misrepresentation, [or] fraud * * *," or "any other intentional conduct involving dishonesty, fraud, deceit or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice." ABA Standard 5.11. This court has noted that the listed examples of "serious" criminal misconduct "are of a kind that pose an immediate threat to the public," in contrast to less serious offenses such as misrepresenting one's address on a driver's license application. *In re Flannery*, 334 Or 224, 233, 47 P3d 891 (2002). The accused's crimes here involved conduct that posed an immediate threat to the public and involved misrepresentation and fraud. We therefore conclude that the accused's actions here involved "serious criminal conduct" and conduct involving deceit and misrepresentation that seriously adversely reflects on his fitness to practice.[8] For that reason, disbarment is warranted as a preliminary potential sanction.

E. *Aggravating and Mitigating Factors*

■ ■  Next, we consider the applicable aggravating and mitigating factors. As to aggravating factors, we agree with the trial panel that the accused had a dishonest or selfish motive, and that he fails to acknowledge the wrongful nature of his conduct.[9] The trial panel also determined that the sanction should be enhanced because "the [a]ccused is an experienced attorney, has practiced law for over thirty years, and is

---

[8] The accused admitted before the trial panel that he undertook the culpable conduct here in his capacity as a lawyer representing his mother, not as a private individual. The fact that the accused considered deceit and misrepresentation to be appropriate tools in a legal representation casts serious doubt on his fitness to practice law.

[9] The aggravating factor of failing to acknowledge wrongful conduct cannot be used to penalize an accused simply for defending himself against disciplinary

admitted to practice law in four [s]tates." The ABA Standards state that "substantial experience in the practice of law" may be considered as an aggravating factor. ABA Standard 9.22(i). Although the accused did not have substantial experience representing clients, he held responsible legal positions, including working as a hearings officer and mediator, for many years. We agree with the trial panel that the accused has "substantial experience in the practice of law." However, we disagree with the trial panel's reliance on the fact that the accused is admitted to practice in four states as tending to prove "substantial experience." That fact adds nothing to the evidence as to the accused's actual experience working on legal matters.

■　　We also find the accused's multiple offenses to be an aggravating factor under ABA Standard 9.22(d). The accused committed three separate violations of DR 1-102(A)(2) and three separate violations of DR 1-102(A)(3)—one violation of each rule for each of his three criminal convictions. More importantly, those violations were not simply the result of multiple charges brought by the Bar regarding a single act by the accused. Rather, the accused's false 9-1-1 call was separated in time and place from his subsequent feigned injury and his false accusations of Atiyeh. The accused engaged in several distinct acts, each of which constituted a separate violation of the disciplinary rules, and those multiple violations are an aggravating factor for sanctions purposes. *Compare In re Summer*, 338 Or 20, 41, 105 P3d 848 (2005) (accused did not commit multiple offenses; instead, he committed "one bad act that [was] charged under multiple rules").

The trial panel found no mitigating factors. We find several. The accused has no prior disciplinary record, and he made a full and free disclosure of his criminal convictions to the disciplinary board. ABA Standards 9.32(a), (e). In addition, the accused has received other penalties or sanctions have been imposed on the accused for his misconduct: He

charges. *In re Davenport*, 334 Or 298, 321, 49 P3d 91 (2002). Here, however, the accused's behavior went far beyond mounting a vigorous defense against the disciplinary charges. The accused acknowledged the factual accuracy of the Bar's complaint in nearly all material respects, but he claimed (and still claims) that that conduct was not blameworthy. Under those circumstances, the Bar is correct that the accused has failed to acknowledge the wrongful nature of his conduct.

paid a fine of $1,760, and he served a brief period in jail. ABA Standard 9.32(l) (amended 1992).

■ The accused urges us to consider, as an additional mitigating factor, the future reciprocal discipline from the other states in which he is admitted. He cites *Summer* as an example of a case in which this court considered future pending discipline in another jurisdiction. 338 Or at 41. That portion of *Summer* is distinguishable because, in that case, the pending out-of-state discipline was an original proceeding brought by the Idaho Bar. In this case, the pending discipline to which the accused refers is reciprocal discipline that other jurisdictions may impose based on the discipline imposed in this proceeding. Therefore, we decline to consider pending reciprocal discipline as a mitigating factor here.

F. *Case Law*

Finally, we turn to this court's case law. The sanctions for cases in which an accused has violated DR 1-102(A)(2) or (3) vary greatly. *Compare In re Albrecht*, 333 Or 520, 42 P3d 887 (2002) (disbarment) *with In re Kimmell*, 332 Or 480, 31 P3d 414 (2001) (six-month suspension). Although each case stands on its own facts, a review of the cases indicates that several factors have influenced this court in determining the appropriate sanction for violations of those rules. Greater sanctions have been imposed when an accused lawyer has violated multiple rules. *See, e.g., Albrecht*, 333 Or 520 (accused disbarred for violating four separate disciplinary rules); *In re Leonhardt*, 324 Or 498, 930 P2d 844 (1997) (accused disbarred for violating nine separate disciplinary rules). Sanctions also have been greater when an accused lawyer has lied under oath or to a tribunal. *See, e.g., In re Gustafson*, 333 Or 468, 41 P3d 1063 (2002) (accused lied under oath to a juvenile court regarding her compliance with a subpoena); *Leonhardt*, 324 Or 498 (accused, a prosecutor, disbarred after lying to a grand jury and in her testimony in a criminal trial).

The facts in this case are most similar to those in *Summer* and *In re Davenport*, 334 Or 298, 49 P3d 91 (2002). In *Summer*, the accused lawyer fraudulently attempted to recover twice from separate insurers for his client's injuries. An Idaho jury convicted him of attempted grand theft by

deception. This court found that, in committing that crime, the accused had violated DR 1-102(A)(2) and (3) and DR 7-102(A)(5); that his mental state had been intentional; and that he had acted with a dishonest motive. This court suspended the accused from the practice of law for 180 days.

In *Davenport*, the accused lied under oath in a deposition and asserted the lawyer-client privilege when he knew that it did not apply. This court determined that, although the accused had not been convicted of a crime, he had committed a "criminal act" by making a false material declaration under oath. The court concluded that the accused had violated DR 1-102(A)(2), (3), and (4), and DR 7-102(A)(5); that the accused had acted intentionally; and that he had acted with a dishonest motive, among other aggravating factors. This court suspended the accused from the practice of law for two years.

In our view, this case falls somewhere between *Summer* and *Davenport*. Like the accused in *Summer*, the accused here committed criminal acts involving dishonesty, but he did not lie under oath or before a tribunal. However, the accused's conduct here caused actual as well as potential injury, while the misconduct in *Summer* caused potential injury only. Moreover, as previously noted, the accused committed multiple offenses, while the accused in *Summer* committed a single bad act. The facts here support a more severe sanction than in *Summer*, and we conclude that a one-year suspension is appropriate.

The accused is suspended from the practice of law for a period of one year, commencing 60 days from the date of filing of this decision.