Argued and submitted January 7, respondent suspended from practice of law for period of five years, commencing on date of this decision April 22, 2021

## In re Complaint as to the Conduct of

### ERIK GRAEFF,
OSB No. 102169,
*Respondent/Cross-Petitioner.*

### (OSB 18175, 18197) (SC S067639)

485 P3d 258

The Oregon State Bar brought a disciplinary action against the accused lawyer, alleging violations of the Rules of Professional Conduct, arising out of his criminal conviction for intentionally discharging a firearm at a building and recklessly endangering another, and arising out if his failure to communicate with his clients in a matter. A trial panel of the Disciplinary Board found that the respondent's criminal misconduct violated RPC 8.4(a)(2) but that the Bar had not proved the accused had violated the rules relating to communicating with clients, and it suspended the respondent for a period of three years. *Held*: On *de novo* review, the court concluded that there was clear and convincing evidence that the respondent committed all of the charged violations of the disciplinary rules and that the respondent should be suspended from the practice of law for a period of five years.

The respondent is suspended from the practice of law for five years, commencing on the date of this decision.

On review of the decision of a trial panel of the Disciplinary Board.

Susan R. Cournoyer, Assistant Disciplinary Counsel, Tigard, argued the cause and filed the briefs for the Oregon State Bar.

Erik Graeff, Vancouver, Washington, argued the cause and filed the briefs on behalf of himself.

Before Walters, Chief Justice, and Nakamoto, Flynn, Duncan, Nelson, and Garrett, Justices, and Kistler, Senior Judge, Justice pro tempore.*

PER CURIAM

Respondent is suspended from the practice of law for a period of five years, commencing on the date of this decision.

_____

  * Balmer, J., did not participate in the consideration or decision of this case.

## PER CURIAM.

In this lawyer discipline case, the Oregon State Bar charged respondent with violating Rule of Professional Conduct (RPC) 8.4(a)(2) (prohibiting commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer) after he fired six bullets into the occupied offices of a lawyer with whom he was having a professional dispute, narrowly missing one of the occupants of the building.[1] In an unrelated matter, the Bar also charged respondent with violating RPC 1.4(a) (requiring lawyer to keep client reasonably informed about status of a matter and promptly comply with reasonable requests for information) and RPC 1.4(b) (requiring lawyer to explain a matter to extent reasonably necessary to permit client to make informed decisions regarding the representation), based on his failure to timely inform his clients that he had withdrawn from the representation or that the defense had moved for summary judgment in their case.

A trial panel of the Disciplinary Board found that respondent's criminal misconduct violated RPC 8.4(a)(2) but that the Bar had not proved by clear and convincing evidence that respondent's failure to communicate with his clients violated RPC 1.4(a) or (b). The panel concluded that a three-year suspension from the practice of law was an appropriate sanction. On review in this court, the Bar urges us to conclude, in accordance with the trial panel's finding, that respondent engaged in criminal misconduct in violation of RPC 8.4(a)(2) and to conclude, contrary to the trial panel's finding, that respondent failed to communicate with his clients in violation of RPC 1.4. The Bar asks that we disbar respondent rather than impose a suspension. On a cross-petition for review, respondent urges the court to adopt the trial panel's findings in all respects and conclude that he

---

[1] Based on that same misconduct, the Bar also charged respondent with violating ORS 9.527(2) (Supreme Court may disbar, suspend, or reprimand a member of the bar who has been convicted of a felony). However, the Bar withdrew that statutory charge for purposes of review in this court, noting that the court has advised the Bar not to charge violations of ORS 9.257 when the acts allegedly violating the statute also would constitute a violation of a disciplinary rule. *In re Strickland*, 339 Or 595, 602 n 7, 124 P3d 1225 (2005) (declining to address alleged violation of ORS 9.527); *In re Albrecht*, 333 Or 520, 542, 42 P3d 887 (2002) (same); *In re Kimmell*, 332 Or 480, 487, 31 P3d 414 (2001) (same).

engaged in criminal misconduct in violation of RPC 8.4(a)(2) but that he did not fail to communicate with his clients in violation of RPC 1.4. Respondent asks that we suspend him for one year rather than three years. For the reasons that follow, we conclude that respondent both engaged in criminal conduct and failed to communicate with his clients, violating his ethical duties to the public and to his clients, and we suspend him for five years.

## BACKGROUND

We review a decision of the trial panel *de novo*. ORS 9.536(2); Bar Rule (BR) 10.6. The Bar must establish misconduct by clear and convincing evidence, BR 5.2, which is "evidence establishing that the truth of the facts asserted is highly probable," *In re Kirchoff*, 361 Or 712, 714, 399 P3d 453 (2017) (internal quotation marks omitted). We find the following facts by clear and convincing evidence.

Respondent is an Iraq war veteran and suffers posttraumatic stress disorder (PTSD) resulting from his deployment. He went to law school after his honorable discharge from the military. He was admitted to practice law in Oregon in 2010, and he has been a solo practitioner for most of his career. After his father's death in 2015, respondent began to drink heavily. He entered a Veterans Administration treatment program, but he was unsuccessful at achieving sobriety. At the time of the incident leading to this disciplinary matter, respondent was not involved in any substance abuse treatment program.

Respondent met Terrance Hogan, a lawyer in Beaverton, around 2011. Hogan became a friend as well as a professional and personal mentor and advisor to respondent. Hogan also occasionally referred work to respondent. In 2017, Hogan hired respondent to file a case in Washington, where respondent was admitted to practice law. Respondent and Hogan began disputing the scope of the duties that respondent had been hired to perform. Respondent claimed that he was hired to file the case and nothing more; Hogan claimed that respondent was hired to accept all responsibility for the case. In any event, Hogan did not step in to assume responsibility for the case, and opposing counsel began pressuring respondent to move forward with discovery.

In December 2017, on the day of the incident lead-ing to this disciplinary proceeding, respondent and Hogan argued about the case and sent heated emails to each other. At around 4:30 p.m., respondent sent Hogan an email threatening that he would show up at Hogan's office if traffic were not so heavy. Respondent later testified that he had been drinking beer most of that day. Between 6:00 p.m. and 7:00 p.m., during rush-hour traffic, respondent drove from Northeast Portland to Hogan's office in Beaverton. From the side of the road, he fired six rounds from a pistol at and into the building where Hogan's law firm was located. Three shots hit the brick siding, one hit a metal exterior door, and two went through one of the law firm's lighted office win-dows. The law firm manager was in the office at the time. The police report stated that an investigator had recon-structed the trajectory of the bullets that went through the windows and found that one of the bullets had passed just to the manager's left, about seven inches from her head, and hit the back of a computer. Respondent immediately left the scene and drove to his home in Vancouver, Washington.

After a police investigation, respondent was charged with one count of unlawful use of a weapon in violation of ORS 166.220(1)(a) (firing a weapon at a person) (a class C felony), one count of unlawful use of a weapon in violation of ORS 166.220(1)(b) (firing a weapon at a building) (a class C felony),[2] and one count of recklessly endangering another person in violation of ORS 163.195 (a class A misdemeanor). Respondent consistently maintained that he did not inten-tionally fire his weapon at a person, and he negotiated a plea agreement under which he entered a guilty plea in October 2018 to one count of unlawful use of a weapon in violation of ORS 166.220(1)(b), for shooting at the building, and to

---

[2] ORS 166.220(1) provides:

"A person commits the crime of unlawful use of a weapon if the person:

   "(a) Attempts to use unlawfully against another, or carries or possesses with intent to use unlawfully against another, any dangerous or deadly weapon as defined in ORS 161.015; or

   "(b) Intentionally discharges a firearm *** within the city limits of any city or within residential areas within urban growth boundaries at or in the direction of any person, building, structure or vehicle within the range of the weapon without having legal authority for such discharge."

the reckless endangerment charge.[3] In January 2019, the court imposed a sentence of 18 months in prison followed by two years of post-prison supervision on the gun charge and a suspended five-year term of probation on the reckless endangerment charge. Respondent served 10 months in prison and has since been released; at the time of the trial in the disciplinary proceeding, he was serving his term of post-prison supervision.

In an unrelated matter, respondent also was charged with two disciplinary violations based on his failure to communicate with clients. Those charges arose out of a lawyer malpractice case that respondent had filed on behalf of clients Stull and Buchanan against lawyer Roller. In early October 2017, Roller took the depositions of Stull and Buchanan. At the conclusion of the depositions, Stull emailed respondent raising concerns about judicial bias in the underlying case (in which Roller had represented Stull and Buchanan). The next morning, on October 6, respondent responded to that email, expressing his extreme skepticism about their claims of judicial bias and their chances at trial in the malpractice action. In particular, respondent stated that Stull's deposition had been an "absolute disaster" and that a jury would never believe him. He recommended that they dismiss the malpractice case.

On October 9, respondent filed a motion to withdraw from the case. The motion and the certificate of service show that respondent mailed a copy of that motion to Stull and Buchanan at an incorrect address. However, he did not email them a copy of that motion, although that was the way that he typically had communicated with them.

On October 22, Stull and Buchanan sent respondent an email stating that they wished to continue pursuing their case. Respondent did not reply. On October 27, Roller's lawyer filed a motion for summary judgment, and he served it only on respondent. Respondent did not transmit a copy of that motion to Stull and Buchanan.

On November 2, the court granted respondent's motion to withdraw. On November 7, Stull and Buchanan

---

[3] The unlawful use of a weapon charge under ORS 166.220(1)(a), based on firing a weapon at a person, was dismissed as part of that plea deal.

emailed respondent asking how he planned to respond to the motion for summary judgment.[4] Respondent replied by email later that day that he no longer represented them.

PROCEEDINGS BEFORE THE TRIAL PANEL

The trial panel found that the Bar had proved by clear and convincing evidence that respondent's conduct in the shooting incident was "criminal conduct that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects" in violation of RPC 8.4(a)(2).

With respect to the Stull and Buchanan matter, as we have stated, the Bar charged respondent with violating RPC 1.4(a) and (b). In respondent's answer to the formal complaint, he admitted the facts recounted above and he admitted that his conduct violated RPC 1.4(a). He denied that his conduct violated RPC 1.4(b). At trial, however, he withdrew his admission to the RPC 1.4(a) violation.[5] The Bar informed the trial panel that, because of respondent's admission, it had not planned to call any witnesses to prove those violations. For that reason, the evidence of respondent's misconduct in the record was limited to certain exhibits that the Bar had introduced without objection. Based on the evidence in the record, the trial panel found, without analysis, that the Bar had failed to meet its burden to prove the charges against respondent. The trial panel ultimately determined that a three-year suspension from the practice of law was the appropriate sanction for respondent's misconduct in the shooting incident.

The Bar and respondent cross-petitioned for review of the trial panel's decision. As noted, the Bar seeks review of the trial panel's determination that respondent did not violate RPC 1.4(a) or (b) by failing to communicate with Stull and Buchanan about his withdrawal from representation and about the summary judgment motion, and it urges this court to disbar respondent for his violation of RPC 8.4(a)(2). Respondent challenges only the trial panel's

---

[4] The record does not reflect how Stull and Buchanan learned about the motion.

[5] Respondent was not allowed to amend his answer, but he was permitted to testify at the hearing to dispute the admission and to explain why he initially admitted the violation.

sanction determination; he argues that a one-year suspension from the practice of law is an appropriate sanction for his misconduct.

## VIOLATIONS

Respondent concedes that he committed the crimes of unlawful use of a weapon and reckless endangerment, and he does not challenge the trial panel's conclusion that, in committing those crimes, he violated RPC 8.4(a)(2). We agree that respondent's commission of those crimes reflects adversely on his fitness as a lawyer; the crime occurred in the context of a professional dispute with another lawyer, and it demonstrated a disrespect for the law and for the rights and safety of others. We therefore find, by clear and convincing evidence, that respondent violated RPC 8.4(a)(2).

We now consider the Bar's argument that respondent's conduct with respect to Stull and Buchanan violated RPC 1.4(a) and (b), which require lawyers to maintain reasonable communications with their clients. RPC 1.4 provides:

"(a)   A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

"(b)   A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

For purposes of the Rules of Professional Conduct, the terms "'[r]easonable' and 'reasonably' *** denote the conduct of a reasonably prudent and competent lawyer." RPC 1.0(k). That is, RPC 1.4(a) and (b) require lawyers to respond to reasonable requests for information and keep their clients reasonably informed about the status of the matter.

As this court stated in *In re Groom*, 350 Or 113, 124, 249 P3d 976 (2011), "deciding whether a lawyer has violated RPC 1.4 requires a careful examination of all of the facts." In *Groom*, the court set out several factors to consider in determining whether a lawyer's failure to communicate violates RPC 1.4: the length of time between information coming to a lawyer's attention and the lawyer's communication of that information to the client; whether the lawyer failed

to respond promptly to the client's reasonable request for information; and whether the lawyer knew, or a reasonable lawyer would have foreseen, that delay in communication would prejudice a client. *Id*. The court also noted that, in certain circumstances, a lawyer may be required to communicate information immediately in order to keep a client reasonably informed and that RPC 1.4, in many circumstances, places responsibility on the lawyer to initiate the communication. *Id*. Furthermore, the court stated, a lawyer's obligation to keep a client reasonably informed exists regardless of the merits of the client's claim or position:

> "If a client's claim or position lacks merit, that lack, and not the lawyer's failure to communicate, ordinarily will be the cause of the client's lack of success and any resulting prejudice. In such a circumstance, the fact that a lawyer's failure to communicate does not prejudice the client does not relieve the lawyer of the ethical duty to communicate."

*Id*.

Although the Bar did not call witnesses to testify in the proceeding below, the trial panel found that the following facts are established by the documents that the Bar had entered into the record: Respondent decided to withdraw from representing Stull and Buchanan on October 9, 2017. He then (perhaps accidentally) used an incorrect address and consequently failed to serve them by mail with his motion to withdraw, and he also did not email them a copy of the motion, which is how he primarily had been communicating with them. Respondent took no further action to communicate with Stull and Buchanan, even after they emailed him to tell him they wanted to continue to pursue the case, and even though it was clear from that email message that they were not aware that he had moved to withdraw from the case.

Respondent also did not communicate with them when, later that week, Roller's lawyer filed a summary judgment motion and served it on respondent but not on Stull and Buchanan. Specifically, respondent did not forward a copy of the motion to Stull and Buchanan or even tell them that a dispositive motion had been filed against their complaint. And when the trial court granted respondent's

motion to withdraw on November 2, respondent took no steps to inform Stull and Buchanan that they no longer had counsel, even though a dispositive motion was then pending against them and a response would be due in two weeks.[6] Indeed, respondent did not inform Stull and Buchanan that he had withdrawn until five days later, when he received an email from them asking him what their response to the summary judgment motion should be. It was only then that respondent told his clients that he no longer represented them.[7]

After reciting the foregoing facts, the trial panel concluded, without explanation, that "the exhibits admitted that relate to the charge are insufficient to meet the Bar's burden." We disagree.

Although respondent's failure to communicate with Stull and Buchanan extended over a relatively short period of time, it took place during a critical phase of their malpractice case against Roller. Having moved to withdraw and having been served with the opposing party's motion for summary judgment, a reasonable lawyer would have foreseen that his clients could be prejudiced by a delay in alerting them that a dispositive motion had been filed in their case and that he did not intend to respond on their behalf, because they would be unaware that they needed to act quickly to find new counsel to respond for them. We therefore find by clear and convincing evidence that respondent violated RPC 1.4(a) when he failed to inform Stull and Buchanan that he had withdrawn from the representation and that opposing counsel had filed a motion for summary judgment. We also find by clear and convincing evidence that respondent violated RPC 1.4(b) when he failed to explain to Stull and Buchanan the significance of those developments, including their urgent need to find substitute counsel and whether and when to respond to the motion for summary judgment.

---

[6]  Under ORCP 47 C, the adverse party has 20 days to respond to a summary judgment motion. The summary judgment motion was filed on October 27, 2017; a response would have been due on November 16.

[7]  Respondent does not challenge those facts on review in this court. Indeed, in his brief to this court, respondent specifically incorporates by reference all the facts found by the trial panel in its opinion.

## SANCTION DETERMINATION

We proceed to consider the appropriate sanction for respondent's misconduct. In so doing, we refer to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) and Oregon case law. *In re Webb*, 363 Or 42, 50, 418 P3d 2 (2018). Under the ABA Standards, the court makes a preliminary determination of the appropriate sanction by considering the ethical duty violated, the respondent's mental state at the time of the misconduct, and the potential or actual injury caused by the respondent's misconduct. ABA Standard 3.0. From there, we consider the existence of any aggravating or mitigating circumstances that may justify either an increase or a decrease in the presumptive sanction. *In re McGraw*, 362 Or 667, 693, 414 P3d 841 (2018). Finally, we consider the appropriate sanction in light of this court's case law. *Id.*

We begin with the factors set out in ABA Standard 3.0 and address each in turn.

First, in committing criminal acts that violated RPC 8.4(a)(2), respondent violated a duty to the public to maintain his personal integrity and, more generally, to maintain the public's confidence in the integrity of officers of the court. ABA Standard 5.0; *In re Murdock*, 328 Or 18, 25, 968 P2d 1270 (1998) (Under ABA Standard 5.0, "[a] lawyer owes a duty to the public to maintain personal integrity and to maintain the public trust."). And in his conduct respecting Stull and Buchanan, respondent violated his ethical duty to his clients to act with reasonable diligence. ABA Standard 4.4. Respondent's violation of those duties raises significant questions about his fitness as a lawyer.

Second, respondent acted both intentionally and knowingly. With respect to the violation of RPC 8.4(a)(2), respondent acted intentionally, that is, with the "conscious objective or purpose to accomplish a particular result." ABA Standards at 7 (so defining "intent"). Respondent pleaded guilty to the unlawful use of a weapon, and a person commits that crime when he or she "intentionally" discharges a firearm at a building. ORS 166.220(1)(b) ("A person commits the crime of unlawful use of a weapon if the person

\*\*\* [i]ntentionally discharges a firearm" at a building). With respect to the violations of RPC 1.4(a) and (b), respondent acted knowingly—that is, with the "conscious awareness of the nature or attendant circumstances of the conduct but without a conscious objective or purpose to accomplish a particular result." ABA Standards at 7 (so defining "knowledge"). Although respondent may have acted negligently when he initially failed to inform Stull and Buchanan that he had moved to withdraw from their representation—he served them at the wrong address, and he may have done so mistakenly—his subsequent actions were knowing. When Stull and Buchanan emailed respondent to tell him that they wished to continue pursuing their case against Roller, respondent knew that he had moved to withdraw and that he was not responding to their request for assistance. When respondent received Roller's motion for summary judgment, and, a few days later, when the trial court granted respondent's motion to withdraw, respondent knew that he had not forwarded a copy of the summary judgment motion to his clients or advised them to seek new counsel. At each of those junctures, respondent's failure to communicate with Stull and Buchanan was knowing.

Third, respondent's acts caused both actual and potential injury. Respondent's criminal acts caused actual and serious emotional anguish to the law firm manager and to Hogan,[8] as well as actual physical damage to the premises. Those acts also caused serious potential injury. Potential injury is "the harm \*\*\* that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." ABA Standards at 7. Respondent shot a gun into a law office window, and it was reasonably foreseeable that doing so could cause physical injury to people who might be in the office. In fact, one of the bullets that respondent fired narrowly missed the

---

[8] Respondent refuses to concede that Hogan suffered any actual injury from respondent's criminal conduct. However, Hogan testified before the trial panel about the effect of the incident on his mental well-being, stating that he was shaken to the point of quitting his job over the events, and the trial panel found that respondent's conduct caused "damage to the psyche[] of \*\*\* the target of his anger, Hogan."

office manager; but for the seven inches by which the bullet missed her, the office manager would have been physically, as well as emotionally, injured. And, although the Bar did not adduce evidence that respondent's failure to communicate with Stull and Buchanan caused them actual injury, respondent's failure occurred at a time when they were required to respond to a dispositive motion. It was reasonably foreseeable that, without a lawyer to represent them, they would be prejudiced in responding to that motion.

We next consider the presumptive sanction for respondent's violations. Under the ABA Standards, disbarment is the presumptive sanction when:

"(a)   a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

"(b)   a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

ABA Standard 5.11. In contrast, suspension is the presumptive sanction when:

"a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice."

ABA Standard 5.12.

The Bar contends that we should apply ABA Standard 5.11 in this case and disbar respondent because respondent committed a violent criminal act involving a deadly weapon, thereby putting others at risk. The problem with that argument is that ABA Standard 5.11 does not include such an act in the list of acts for which disbarment is the presumptive sanction. And the Bar does not argue

that respondent committed an act that *is* included in that list.[9] ABA Standard 5.11, thus, does not apply.

However, ABA Standard 5.12, for which the presumptive sanction is suspension, also is not a perfect fit. That standard applies when a lawyer "*knowingly* engages in criminal conduct which does not contain the elements listed in ABA Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice." (Emphasis added.) As discussed, we have found that respondent *intentionally* engaged in criminal conduct that seriously and adversely reflects on his fitness to practice law.

Although ABA Standard 5.11 is not applicable by its terms, respondent's conduct is, in many respects, closer to the conduct described in ABA Standard 5.11 than it is to the conduct described in ABA Standard 5.12. For one thing, as we have just observed, respondent's conduct in the shooting incident was intentional, not knowing. In addition, ABA Standard 5.11 applies not only when a lawyer commits the crimes of killing or attempted killing; it also applies to crimes that involve a serious violation of a lawyer's duties as an officer of the court and that undermine public confidence in the rule of law. That is, ABA Standard 5.11 applies to "serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft." ABA Standard 5.11(a). Although respondent did not commit such a crime, he did forsake established legal channels for resolving business disputes and, instead, committed an act of violence that implicates his duties as an officer of the court and that undermines public trust and confidence in the legal system.

Given that respondent's conduct does not squarely fall under either ABA Standard 5.11 or ABA Standard 5.12,

---

[9] The list includes the attempted intentional killing of another. We observe that proof of a criminal conviction is not required for a finding of a disciplinary rule violation if, even in the absence of a conviction, the record establishes that a particular crime occurred. *In re Walton*, 352 Or 548, 554 n 5, 287 P3d 1098 (2012) (so stating). However, the Bar does not argue that the record establishes that respondent committed that crime. Indeed, at oral argument before this court, the Bar conceded that the record does not establish that respondent knew that the building was occupied when he fired his gun at it.

we conclude that either disbarment or suspension may be justified, depending on the balance of aggravating and mitigating factors.

Here, the trial court found the following aggravating factors: (1) respondent had a dishonest or selfish motive—to settle a dispute with Hogan by threats and violence, ABA Standard 9.22(b); (2) respondent committed multiple offenses, ABA Standard 9.22(d); (3) the office manager was a vulnerable victim in the circumstances—she was unsuspecting of danger, and, therefore, completely defenseless when the bullets entered the building, ABA Standard 9.22(h); (4) respondent has substantial experience in the practice of law, ABA Standard 9.22(i); and (5) respondent engaged in illegal conduct, ABA Standard 9.22(k).

We agree that those circumstances are present, and we also find a sixth aggravating factor—that respondent still refuses to acknowledge the wrongful nature of his conduct in failing to communicate with his clients, Stull and Buchanan. ABA Standard 9.22(g). Although respondent initially admitted his violation of RPC 1.4(a), he withdrew his admission at trial, putting the Bar to its proof. The Bar adduced the facts recited above, and respondent neither disputes them nor offers a plausible legal argument that his admitted conduct did not violate the rules. As this court has explained, when a lawyer admits the Bar's factual allegations in nearly all material respects but does not offer a plausible legal argument explaining why the conduct does not violate the rules and, instead, continues to claim that the conduct was not blameworthy or detrimental, the lawyer has failed to acknowledge the wrongful nature of his conduct. *In re Maurer*, 364 Or 190, 204-05, 431 P3d 410 (2018).

On the other side of the scale, the trial panel found the following mitigating factors: (1) respondent had no prior disciplinary record, ABA Standard 9.32(a); (2) respondent suffered from personal and emotional problems—namely, he suffered from PTSD as a result of his military service and began drinking heavily after his father's death, ABA Standard 9.32(c); (3) respondent fully cooperated with the disciplinary board, ABA Standard 9.32(e); and (4) respondent

was subjected to a term of imprisonment and other penalties for his criminal behavior, ABA Standard 9.32(k).

We agree that those mitigating factors are present in this case. We turn to respondent's argument that we should recognize two additional mitigating factors—one based on his mental disability and chemical dependency, ABA Standard 9.32(i), and one based on his reimbursement of the insurance company for the damages he caused to Hogan's law offices in the shooting, ABA Standard 9.32(d). Respondent bears the burden of proving the existence of those mitigating factors. *Webb*, 363 Or at 56 n 5.

ABA Standard 9.32(i) provides that a lawyer's mental disability or chemical dependency, including alcoholism, is a mitigating factor when all four of the following circumstances are present:

"(1)   there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

"(2)   the chemical dependency or mental disability caused the misconduct;

"(3)   the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

"(4)   the recovery arrested the misconduct and recurrence of that misconduct is unlikely."

We agree with respondent that the first circumstance is present: there is medical evidence in the record that he is affected by alcoholism and PTSD resulting from his military service. But, as we will explain, respondent did not demonstrate that those conditions rendered him unable to refrain from engaging in the criminal acts he committed.

In a case of intentional misconduct, we have concluded that, to prove that a mental disability or chemical dependency caused that misconduct, a lawyer must prove that the condition rendered the lawyer unable to "conform his or her conduct and refrain from engaging in the intentional act." *Webb*, 363 Or at 57-58. Here, respondent testified about the effects of his PTSD and alcohol on his life, and asks that we draw the inference that he would not have

committed the criminal act of shooting at Hogan's offices if not for his "ongoing pervasive alcohol abuse and current intoxication." Respondent contends that Hogan's testimony that respondent's "problems consumed him" supports his position.

In some sense, we agree with respondent that his alcohol dependency was a cause of his misconduct. We have no doubt that respondent's judgment was impaired by his mental disability and chemical dependency; as noted, we conclude that respondent's PTSD and the exacerbation of his alcoholism after his father's death are personal and emotional problems that are mitigating factors in our sanction determination under ABA Standard 9.32(c). Thus, to some degree, respondent's alcohol dependency and his PTSD may be considered as mitigating factors. However, as we will explain, those conditions cannot excuse respondent's intentional acts.

As described above, the record establishes that respondent traded insults and threats with Hogan by email, and, at around 4:30 p.m., as evidenced by his last email to Hogan, respondent began to think about going to Hogan's office to confront him. Around two hours later, respondent turned that thought into action; between 6:00 p.m. and 7:00 p.m., he drove through rush-hour traffic to Hogan's office with a loaded gun. Respondent's impairment, thus, did not interfere with his ability to develop a plan to commit the criminal act and then carry it out. In light of those facts, we are not persuaded that respondent's impairment prevented him from being able to conform his behavior to the requirements of the disciplinary rules or that we should give greater weight to his impairment than did the trial panel.

We do agree with respondent, however, that his payment of restitution to the insurance company for the damage to Hogan's law offices constitutes a mitigating factor in our sanction analysis. ABA Standard 9.32(d) provides that a "timely good faith effort to make restitution or to rectify consequences of misconduct" is a mitigating factor. The record demonstrates that, in August 2018, several months before defendant's convictions on the shooting charges, the

Liberty Mutual Group approached respondent for reimbursement of the amount that it had paid on the insurance claim for damage to the building. According to respondent's undisputed testimony, respondent agreed to reimburse the insurance company and drafted a promissory note setting out his obligation to pay the amount of the claim, $7,732.74. Respondent paid $2,000 upon signing the agreement, timely made required installment payments, and paid off the remaining balance in January 2019.

The Bar contends that those efforts cannot qualify as mitigating restitution because respondent made those payments to settle the insurance company's claims against him and thereby received a benefit, namely a release of those claims.[10] However, the Bar offers no support for its argument that voluntary restitution is not mitigating if a lawyer receives some benefit from it, and we find none. ABA Standard 9.32(d) contains no requirement that the respondent's decision to make restitution be altruistic, and we can think of no persuasive reason to impose such a requirement. We conclude that we can consider respondent's timely agreement to pay for the damage he caused and his fulfillment of that agreement as mitigating conduct.

It is difficult to determine where that leaves us. As we have discussed, the ABA Standards for determination of a preliminary sanction are not a perfect fit. They do not make disbarment the presumptive sanction for respondent's misconduct, but the aggravating circumstances present in this case—the most serious of which are that respondent engaged in criminal conduct that caused actual emotional injury and potentially grave physical injury to a vulnerable person—permit that result.

Pointing in the other direction, though, are respondent's personal circumstances, his PTSD and alcoholism, his father's death, his cooperation with the Bar, his otherwise clear disciplinary record, and the fact that respondent already has been punished and paid restitution for

---

[10] The Bar states that, by executing the promissory note, respondent resolved "Liberty Mutual's claim against him." We find nothing in the record to suggest that Liberty Mutual Group had filed any claim against respondent when he entered into the agreement to reimburse the company.

his criminal acts. Were it not for those mitigating factors, we might well decide that respondent should be disbarred. With those factors, however, we conclude that the appropriate sanction is suspension, and we confront the question of how long that suspension should be.

We normally would turn to this court's case law for guidance in that regard, but we can find no Oregon cases presenting factual circumstances that are similar to these. That is, in every case involving serious criminal misconduct, the misconduct fell clearly under ABA Standard 5.11(a) or (b) and the lawyer was disbarred.[11] Our other cases involving serious misconduct are so factually dissimilar to this one that they provide little assistance, except insofar as they confirm that a lengthy period of suspension is appropriate in the most serious cases.[12]

A lengthy period of suspension is undeniably appropriate here. The trial panel recommended a suspension of three years, and we agree that respondent must be suspended for at least that period. We are concerned however, that, even at this point, respondent fails to fully appreciate the enormity of his misconduct. An aggravating factor in this case is that respondent still does not acknowledge the wrongful nature of his conduct in failing to communicate with his clients, and, more importantly, although respondent

---

[11] *See*, *e.g.*, *In re Steele*, 27 DB Rptr 115 (2013) (lawyer disbarred following felony convictions in connection with a murder-for-hire scheme); *Albrecht*, 333 Or 520, 42 P3d 887 (2002) (lawyer disbarred for money laundering); *In re Taylor*, 316 Or 431, 851 P2d 1138 (1993) (lawyer disbarred following felony convictions for distribution of marijuana and failure to file tax returns).

[12] *See, e.g.*, *In re Kluge*, 332 Or 251, 27 P3d 102 (2001) (lawyer suspended for three years for multiple rule violations involving intentional misrepresentations and failure to withdraw when called as witness against client); *In re Eadie*, 333 Or 42, 36 P3d 468 (2001) (lawyer suspended for three years for multiple rule violations involving intentional misrepresentations, incompetence, *ex parte* contacts, and trial misconduct); *In re Parker*, 330 Or 541, 9 P3d 107 (2000) (lawyer suspended for four years for multiple rule violations involving neglect of four clients and failure to cooperate with and false statements to disciplinary tribunal); *In re Christ*, 327 Or 609, 965 P2d 1023 (1998) (lawyer suspended for five years for multiple rule violations involving neglect of legal matter, engaging in conduct prejudicial to the administration of justice, and failure to cooperate with disciplinary tribunal); *In re Bourcier*, 322 Or 561, 909 P2d 1234 (1996) (lawyer suspended for three years for multiple rule violations involving failure to communicate with client, intentional misrepresentations to court, and failure to cooperate with disciplinary tribunal).

acknowledges that his criminal conduct was wrongful, he minimizes it. For example, respondent argues for a suspension of only one year, and, in response to the Bar's characterization of his trial posture as indicating a lack of remorse, respondent defended statements that he had made during his hearing, but he did not take the opportunity to actually express remorse. Instead, respondent discounted the harm that he had caused—he denied harming Hogan and concluded his brief to this court by stating that it "cannot reasonably be disputed [that] *** I in fact hurt nobody."

To recognize the gravity of respondent's criminal conduct and ensure that respondent and other members of the Bar recognize the significance of the ethical standards to which they must adhere, we conclude that the lengthiest of permissible sanctions short of disbarment is warranted. Under BR 6.1(a)(3) the maximum length of a disciplinary suspension that we may order is five years, and that is the suspension we impose.

Respondent is suspended from the practice of law for five years, commencing on the date of this decision.